# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### March 4, 2015 Session

## STATE OF TENNESSEE v. RICKEY ALVIS BELL, JR.

### Automatic Appeal from the Court of Criminal Appeals
### Circuit Court for Tipton County
### No. 6664   Joe H. Walker, Judge

_____

### No. W2012-02017-SC-DDT-DD – Filed September 10, 2015

_____

In this capital case, the jury convicted the Defendant, Rickey Alvis Bell, Jr., of two alternative counts of first degree felony murder, one count of especially aggravated kidnapping, and one count of aggravated sexual battery. The jury sentenced the Defendant to death for the first degree murder based on four aggravating circumstances. On direct appeal, the Court of Criminal Appeals affirmed the Defendant's convictions. The Court of Criminal Appeals concluded that the record did not support two of the aggravating circumstances but nonetheless affirmed the death sentence. We now address the following issues: (1) whether the trial court erred in denying the Defendant's motion to strike the death notice on the ground that he is intellectually disabled; (2) whether Tennessee's statute prohibiting the execution of intellectually disabled persons is unconstitutional; (3) whether the trial court erred in denying the Defendant's two motions for mistrial; (4) whether the trial court erred by refusing to allow the Defendant to adduce evidence that the victim's husband was having an extramarital affair at the time the victim was murdered; (5) whether the evidence was sufficient to support the Defendant's convictions; and (6) our mandatory review of the Defendant's death sentence. Upon our thorough review of the record and applicable law, we affirm the Defendant's convictions and death sentence.

### Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the
### Court of Criminal Appeals Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which CORNELIA A. CLARK and HOLLY KIRBY, JJ., joined. SHARON G. LEE, C.J., filed a separate opinion concurring in part and dissenting in part, in which GARY R. WADE, J., joined.

Juni S. Ganguli (on appeal and at trial), James E. Thomas (on appeal), and James M. Gulley (at trial), Memphis, Tennessee, for the appellant, Rickey Alvis Bell, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; James E. Gaylord, Senior Counsel; D. Michael Dunavant, District Attorney General; and James Walter Freeland, Jr., and Joe Van Dyke, Assistant District Attorneys General, for the appellee, the State of Tennessee.

## OPINION

### Factual and Procedural History

This case arises out of the brutal assault and murder of the victim, Starr Harris, on June 1, 2010. The Defendant, Rickey Alvis Bell, Jr., subsequently was indicted for one count of first degree felony murder during the perpetration of a kidnapping, one count of first degree felony murder during the perpetration of a rape, one count of especially aggravated kidnapping, and one count of aggravated rape. The State filed its notice of intent to seek the death penalty in September 2010. The Defendant sought to dismiss the State's death penalty notice on the basis that he was intellectually disabled. After a hearing, the trial court denied the Defendant's motion. The case proceeded to a jury trial, and the following proof was adduced during the guilt/innocence phase.[1]

The victim lived with her husband, Thomas R. Harris, Jr. ("Husband"), at 57 Richardson Landing Lane in Tipton County, Tennessee ("the House"). Also living with them were several of his and her children. Husband owned a landscaping and property preservation business with Carolyn Kelly Phelps. The victim also worked in the business, performing administrative work from the home office located in the House.

The business required varying numbers of laborers during any given week. The laborers showed up each morning at the House to receive their work assignments, if any, for the day. Husband paid the laborers on a weekly basis, in cash. The laborers were informed that they were paid only for those hours worked. The Defendant was one of Husband's laborers.

On the morning of June 1, 2010, the day after Memorial Day, several of Husband's laborers showed up to collect their pay for the prior week and to get their work assignments for the day. Husband and the victim had been up late the night before, so Husband remained in bed while one of his sons, Ricky Harris ("Son"), handed out the cash wages. Son recalled paying the Defendant $300. When the Defendant arrived at the House to collect his pay, he was wearing black pants or shorts.

---

[1] We will discuss more detailed proof developed at trial in our discussions of specific issues later in this opinion.

2

Later that morning, Son left the House with Husband and Ray Horne to begin the day's work. All three men left in a single vehicle.[2] Before they drove to their first property, they went to Munford Tire to have some tire work done. Munford Tire was located several miles from the House. While the men were waiting for the work to be done, Josh Harris, another of Husband's sons, walked over from a nearby school to join them. All four men went to a nearby restaurant to have lunch. On the way back to the tire shop, Husband got a phone call from the victim at 1:10 p.m.

The Defendant did not receive a work assignment that morning, so he returned home. The Defendant lived at 7612 Richardson Landing Road, less than one mile from the House. The Defendant lived with his mother, Belinda Joyce Bell, and his two brothers. When the Defendant counted his pay, he believed he had been paid $50 less than he was owed. Deciding to inquire about the shortage, the Defendant returned to the House at approximately 1:00 p.m. He was still wearing his black pants. He knocked on the door, and the victim answered. The Defendant asked to speak to Husband. The victim called Husband's cellphone, using the landline at the House. When Husband answered, the victim handed the phone to the Defendant, and the Defendant spoke with Husband about his pay. Husband explained that his pay was $300 instead of $350 because the Defendant had missed a day of work in order to go to the doctor.

Andrew Michael Redditt, one of Husband's neighbors, testified that he saw the Defendant at the House that day at 1:00 p.m. He saw the Defendant knock on the front door, and he saw the victim answer the door. He then saw the Defendant enter the House. Redditt stated that the Defendant was wearing black shorts and a black T-shirt. Tommy Redditt, Andrew's father, testified that he saw a black man who worked for Husband standing near the House at approximately 1:30 p.m. on June 1, 2010.

After speaking directly with the Defendant and on the House landline phone with Husband, the victim exchanged text messages with her friend, Alexia Block, on her cell phone. At 1:22:52 p.m., the victim texted Block, "Ok ty honey! I have a flat tire right now, so . . . my day isn't going so good!" At 1:23:52 p.m., Block texted the victim, "Where r u? Do u need me?" At 1:25:12 p.m., the victim texted Block, "No I'm home . . . the workers tried t fix it or some crap (it had a screw in it) . . . & now they said it can't be fixed . . . uuuugggghhh[.]" At 1:28:03 p.m. Block texted the victim, "I'm sorry! I will pray your day gets better. I love ya[.]" Block received no further texts or other communications from the victim.

The victim also spoke on the phone with Kelly Phelps several times during the first part of the day. Phelps' last phone conversation with the victim was shortly before

---

[2] At one point during his testimony, Horne stated that he was not sure if the three of them left the House in one or two trucks. He later clarified that they took only one truck.

1:00 p.m.  When Phelps called the victim at 2:30 p.m., however, she did not get an answer.  Johnnie Phelps, Phelps' ex-husband, spoke with the victim over the landline phone at 1:30 p.m. that day, and the call lasted approximately one minute.  He described the conversation as normal.

At 2:16 p.m., a FedEx driver delivered a package to the House.  The driver knocked on the front door, but no one answered.

At approximately 8:00 p.m., Nathan McKell, the son of Husband's ex-wife, returned home to the House where he lived with the victim and Husband.  McKell had been working for the business that day, beginning at about noon.  When McKell walked into the House, he noticed that the office furniture where the victim normally worked was in disarray.  He also noticed that the back door was open, although it normally was kept closed.  Neither the victim nor the family's two dogs were in the House.

McKell called Husband and then began looking for the victim outside.  Behind the House was a hilly and heavily wooded area.  McKell began exploring this area on a 4-wheeler.  He turned the vehicle over on a steep hill and when it came to rest, the headlights were shining on the victim's body.  The front of the victim's upper torso was bare, with her shirt ripped open and her bra pulled down to her waist.  The victim was wearing shorts that were buttoned at the waist.  The victim's underwear was pulled up above the waistline of her shorts.  She was barefoot.  One of the investigating officers observed dirt on the back of the victim's shorts that was inconsistent with the surface on which she was found.  The area where the victim's body was located was approximately 100 yards into the woods.

One of the investigating officers, who arrived at the scene at approximately 9:55 p.m. on June 1, described the weather as "extremely hot even though it was at night" and that the "bug activity" was "heavy."  She observed "maggot activity" on the victim's body.  Due to the difficulties presented by the terrain where the victim was found, her body was not removed until approximately 5:00 a.m. on June 2.

Dr. Lisa Funte, a forensic pathologist, performed an autopsy on the victim, beginning on June 2 and concluding on June 3, 2010.  Her report, admitted into evidence, included the following description of Dr. Funte's initial observations of the body as she recovered it from the body bag:  "Fly eggs and maggots are present on all body surfaces.  The maggots appear to be in the early stages of development.  Green to brown-grey discoloration is present on the torso, head, and neck."  Dr. Funte explained at trial:

> Basically this is the beginning of decomposition.  When somebody is outside, natural processes take place.  Bugs find the body.  One of the first

4

players there are flies, and they will lay eggs on the decedent. Those eggs, given a period of time depending on the species of fly, hatch to form the larva or the maggot. Those will then mature, pupate. Sometimes you can see the pupa casings. I did not see pupa casings in this case. And then you'll produce more flies. As decomposition goes on, other types of insects show up and do what they do.

She concluded, "In this case this individual was in a state of very early decomposition."

Dr. Funte testified that the victim suffered "extensive trauma to the neck and to the upper torso." The victim died from "strangulation associated with blunt force injuries." Dr. Funte added that "some of those blunt force injuries were to the extent that they could have caused death in and of themselves." The blunt force injuries included a "basilar hinge fracture" to the base of the victim's skull. Dr. Funte explained that, "[w]hen you have a basilar skull fracture you can cause contusion of the brain stem or a bruising of the brain stem, and that can cause disruption in the rhythm of your heart, which can be fatal." On the right side of the victim's head, Dr. Funte observed "a big gaping, or open, laceration." This wound, a result of blunt force trauma, could have caused fatal intracranial bleeding.

Dr. Funte also noted an injury to the victim's chin, and she explained the significance of this injury as follows:

Well, the most common way to cause a hinge fracture, which is the type of fracture seen in [the victim's] skull, it's a fracture that goes across the base of the skull, is actually an impact of the chin that pushes the head up, fracturing kind of a pivot area around that foramen magnum where the spinal cord comes up.

Dr. Funte testified that the injury to the victim's chin was consistent with a kick to her chin. She also testified that the injuries to the victim's "upper torso of [sic] the neck area" were consistent with stomping.

Dr. Funte testified that the victim had "extensive hemorrhage throughout the soft tissues in the muscles of the anterior neck" and that the victim's hyoid bone was fractured. There also was "bleeding in the muscles and soft tissue of the upper part of the chest." There was hemorrhage in the victim's thyroid gland. These injuries were consistent with a foot, knee, or log depressed onto the victim's neck or upper torso. Dr. Funte did not observe any finger or thumbprints on the victim's neck.

5

Dr. Funte noted blunt force injuries to the victim's legs and dirt on the bottoms of the victim's feet. The victim's left thumbnail was "broken and avulsed," or "ripped off."

Dr. Funte collected hairs that were in the victim's left hand and released those hairs to law enforcement officers. She also collected hairs from the victim's scalp and turned those over to officers. Dr. Funte collected evidence relevant to a "rape kit" and released those materials to Deputy Chief Turner.

Asked about indications of a sexual assault, Dr. Funte testified that there were blunt force injuries to the inside of the victim's thighs. She did not find any trauma to the victim's genitals, but she explained that "[i]t's the rare case where you actually do."

As to the strangulation injuries Dr. Funte observed, she testified that the injuries were consistent with the victim losing consciousness in six to eight seconds. If the pressure sufficient to cause the loss of consciousness continued, the victim would have died within approximately a minute. The fracture to the victim's skull could have caused the victim's death instantaneously or death from the fracture could have taken "minutes or hours." Death from the intracranial hemorrhage could have taken "up to several hours." Dr. Funte could not opine as to the order in which the victim's injuries were inflicted. However, she stated that the victim's strangulation injuries, the skull fractures, and the intracranial hemorrhage all occurred "either prior to or at the time of death." She was unable to estimate the time of the victim's death.

Along with Dr. Funte's autopsy report, associated photographs were admitted into evidence.

On cross-examination, Dr. Funte agreed that, when she removed the victim's body from the body bag, the shorts that the victim was wearing were buttoned. The front of the victim's shorts was pulled down slightly and the victim's panties were pulled above the waistline of the shorts. The shorts were not torn, and the buttoning was not torn or stretched. However, the back side of the shorts appeared to have dirt and a green discoloration "like some plant staining."

Dr. Funte found blood under two of the victim's fingernails on the right hand. Although she found dirt on the bottoms of the victim's feet, she did not note any lacerations or abrasions there.

Dr. Funte clarified that there were at least four impacts to the victim's head and that any of them could have been fatal. Moreover, death from any of those blows to the head could have been instantaneous.

6

After the victim's body was found, the investigation at the crime scene began and continued for several days. Lieutenant Richard Nessly of the Tipton County Sheriff's Office spoke with the Defendant at the Defendant's home on the night of June 1, 2010. The Defendant told Lt. Nessly that he had been to the House that morning to get paid. After he returned home, he realized that his pay was $50 short. The Defendant returned to the House and spoke with "a lady that was there." The "lady" called Husband on the landline and gave the phone to the Defendant after Husband answered. The Defendant spoke with Husband and then returned home. The Defendant told Lt. Nessly that his mother arrived home that afternoon between 2:30 and 2:50 p.m. Lt. Nessly did not observe any cuts or scratches on the Defendant's body or other evidence that the Defendant had been in a struggle. At the Defendant's house, Lt. Nessly noticed wet clothes in the washing machine and an open condom wrapper on the Defendant's bed. The Defendant told Lt. Nessly that he had worn black pants earlier that day but changed into shorts after returning home because it was hot.

The Defendant gave a second statement to law enforcement officers on June 2, 2010, and a third statement on June 8, 2010. These statements largely were consistent with the Defendant's first statement. In his subsequent statements, the Defendant added that he did not go inside the House. In his third statement, the Defendant stated that he left the House the second time at approximately 1:30 p.m. He denied being in the woods behind the House. Shown a photograph of a lighter in the shape of a handgun found near the victim's body, the Defendant denied ever seeing or touching it.

During the Defendant's June 2, 2010 statement, Tennessee Bureau of Investigation ("TBI") Special Agent John Sullivan examined and photographed the Defendant's torso, and he testified that he did not recall seeing any scratches on the Defendant's torso. Sp. Agent Sullivan also observed Husband's body on June 2, 2010, and noticed scratches on his hand and left forearm. Sp. Agent Sullivan testified that Husband's injuries looked "similar" to the scratches Sp. Agent Sullivan got when he worked in his yard, adding that he had not deemed Husband's injuries "significant."

On June 3, 2010, law enforcement officers returned to the crime scene to continue searching for evidence. They found a condom and a lighter that was in the shape of a handgun ("the handgun replica") at a location approximately one hundred feet from the place where the victim's body was found. In the same vicinity, an officer noticed broken branches, one of which had hairs on it. All of these items were collected, and the three hairs collected from the branch subsequently were determined to be "consistent with having a common origin with the source of" the victim's head hairs. Although officers noticed an indentation in the area they described as a "butt print," they did not photograph or videotape this image. A "trail of disturbed leaves" led from this additional crime scene ("the assault scene") to the location of the victim's body ("the final scene").

7

Buccal swabs were obtained from the Defendant with his consent. Forensic examination revealed that the condom retrieved from the assault scene contained the Defendant's semen.[3] The victim's DNA was not identified on the condom. Analysis of the handgun replica resulted in a partial DNA profile that matched portions of the Defendant's DNA profile.[4] The Defendant's DNA was not found on or in the victim's body. Husband's DNA was found in the samples taken from the victim's body for the rape kit. Only the victim's DNA was recovered from the fingernail scrapings of her right hand.

Ten hairs obtained from the victim's left hand during the autopsy were submitted for forensic examination. According to the "scientific examination report" admitted into evidence, six of these ten hairs were determined to be "consistent with having a common origin with the source of" the victim's head hairs. The remaining four of these ten hairs exhibited "hair treatment and damage." Accordingly, "due to the lack of substantial microscopic features, the possible common origin of these hairs" could not be "established or excluded." John Hoang, the trace examiner who analyzed the hairs, described these four hairs at trial as "colorless, grey, or not pigmented."

Sp. Agent Sullivan showed a photograph of the handgun replica to the Defendant's mother on June 8, 2010. She wrote on the front of the photograph, "I see a gun like this a year ago that [one of the Defendant's brothers] have." Sp. Agent Sullivan also walked from the final scene to the Defendant's residence and determined that the distance took seven and one-half minutes to traverse.

The Defendant's mother testified at trial that she arrived home at 2:00 p.m. on June 1, 2010, and that the Defendant was sitting inside when she arrived. The Defendant was wearing a white T-shirt, blue shorts, and white socks without shoes. Bell also stated that she had taken the Defendant to the doctor approximately two weeks before the killing.

---

[3] The DNA recovered from the outside of the condom matched the Defendant's DNA. The expert witness explained that fluid inside a condom "frequently" gets on the outside of the condom. Testing produced only a partial DNA profile from the fluid recovered from the inside of the condom, but this partial profile was consistent with the Defendant's DNA. The expert witness stated that he could not develop a full DNA profile from the fluid inside the condom because it was "insufficient or degraded." He explained that this degradation was not surprising because a fluid in a latex condom cannot "breathe" and "the bacteria are going to have a field day on it" and destroy the DNA.

[4] The laboratory report admitted into evidence states with respect to the DNA analysis of the handgun replica that "[t]he probability of an unrelated individual having the same DNA profile from either the African-American, Caucasian, Southeastern Hispanic, or Southwestern Hispanic populations exceeds the current world population."

Husband testified, and he denied killing the victim. He stated that he did not have any life insurance on the victim. He also stated that he and the victim had had sex during the early morning hours of June 1, 2010. He acknowledged that he sent five text messages to his ex-wife, Rebecca Harris, on the afternoon of June 1 and acknowledged that the messages were not work-related. Phone records reflected that Husband's cellphone was inactive from 1:32 p.m. to 2:19 p.m. on June 1, 2010. Husband admitted that he spoke with Rebecca Harris during the trial about the "grey" hairs referred to earlier in the trial and told her that the hairs might be his because he and the victim had had sex earlier that day and she had not showered. He stated that he took digital photographs of the work he had done on the afternoon of June 1, 2010, but did not turn those photographs over to the police because he was never asked to.

The defense adduced proof that James Arcutt, another laborer for Husband's business, was dating a woman that the Defendant also was dating simultaneously. Arcutt was angry about this situation and did not like the Defendant. Arcutt was seen on the morning of June 1 when he collected his pay at the House, but his whereabouts that afternoon were unknown. Arcutt lived in the same vicinity as the victim and the Defendant.

Rebecca Harris, Husband's ex-wife, testified that Son had told her that he had been "waiting on" Husband to arrive at Munford Tire. She also stated that, earlier in the trial, Husband had talked to her about her testimony.

In rebuttal, Son denied telling Rebecca Harris that he had waited for Husband at Munford Tire.

Based on this proof, the jury convicted the Defendant of first degree murder in the perpetration of a kidnapping; first degree murder in the perpetration of a rape; especially aggravated kidnapping; and aggravated sexual battery as a lesser-included offense of aggravated rape. The trial court merged the felony murder (rape) conviction into the felony murder (kidnapping) conviction. At the ensuing sentencing hearing, the parties stipulated that the Defendant's birthdate was September 2, 1979, and that he was in Pennsylvania in 1997. The State introduced proof that the Defendant had prior convictions in Pennsylvania for robbery of a motor vehicle and aggravated assault, for which he was sentenced in November 1997. The State adduced no additional proof. The defense called a single witness, the Defendant's mother, Belinda Bell.

Bell testified that she loved the Defendant "[v]ery much" and that she always would. She stated that she would "lay down [her] life for him" and that it would hurt her for the Defendant to be executed.

After deliberating for approximately thirty minutes, the jury sentenced the Defendant to death based on four aggravating circumstances: (a) the Defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence to the person; (b) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to cause death; (c) the murder was knowingly committed by the Defendant while he had a substantial role in kidnapping the victim; and (d) the murder was knowingly committed by the Defendant while he had a substantial role in raping or attempting to rape the victim. See Tenn. Code Ann. § 39-13-204(i)(2), (5), (7) (2010) (listing aggravating circumstances). Subsequently, the trial court sentenced the Defendant to twenty years each for the especially aggravated kidnapping conviction and the aggravated sexual battery conviction, to be served concurrently to each other but consecutively to the death sentence.

In this automatic appeal, we address the following issues: (1) whether the trial court erred in denying the Defendant's motion to strike the death notice on the ground that he is intellectually disabled; (2) whether Tennessee's statute prohibiting the execution of intellectually disabled persons is unconstitutional; (3) whether the trial court erred in denying the Defendant's two motions for mistrial; (4) whether the trial court erred by refusing to allow the Defendant to adduce evidence that Husband was having an extramarital affair with Rebecca Harris at the time the victim was murdered; (5) whether the evidence was sufficient to support the Defendant's convictions; and (6) our mandatory review of the Defendant's death sentence.

## Analysis

### I. Claim of Intellectual Disability

Prior to trial, the Defendant filed a "Motion to Dismiss Death Penalty Notice Due to Defendant's Mental Retardation." The Defendant asserted that his I.Q. was 74 and that, taking into account a margin of error of four points, "the possible range of [his] IQ is 70 to 78." Accordingly, he contended, he was not eligible for the death penalty under either Tennessee law or the federal constitution.

Tennessee Code Annotated section 39-13-203 provides that "no defendant with intellectual disability at the time of committing first degree murder shall be sentenced to death." Tenn. Code Ann. § 39-13-203(b) (2010). The statute defines "intellectual disability" as follows:

10

(1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;

(2) Deficits in adaptive behavior; and

(3) The intellectual disability must have been manifested during the developmental period, or by eighteen (18) years of age.

Id. § 39-13-203(a) (the "intellectual disability statute"). The intellectual disability statute also provides that "[t]he burden of production and persuasion to demonstrate intellectual disability by a preponderance of the evidence is upon the defendant. The determination of whether the defendant had intellectual disability at the time of the offense of first degree murder shall be made by the court." Id. § 39-13-203(c).

At the pretrial hearing on the Defendant's motion, the defense called a single witness, Dr. John Robert Hutson, a clinical psychologist. Dr. Hutson testified that he first encountered the Defendant at Lakeside Hospital in 1993. The Defendant was "an in-patient at the adolescent unit," and Dr. Hutson was his treating psychologist. The Defendant was fourteen years old at the time. Dr. Hutson described his observations of the Defendant in the hospital:

I thought he was very polite, a well behaved young man, but not high functioning intelligently [sic]. He was very depressed, but he was not psychotic as I recall and as the records also reflect. He was in touch with reality, he was able to communicate and converse, but he was limited in his intellectual understanding.

The Defendant took the Weschsler Intelligence Scale for Children, third version, I.Q. test while at the hospital, "and he came back with a Full Scale IQ of 77." Dr. Hutson stated that "the reported margin of error at that administration to [the Defendant] was a plus or minus seven points."

Dr. Hutson met twice more with the Defendant in conjunction with the instant case, once in 2010 and once in 2011. Dr. Hutson did not administer another I.Q. test to the Defendant, but, according to Dr. Hutson, "his verbal abilities and everything did seem consistent with that, his understanding, his comprehension."

In reviewing the Defendant's hospitalization records, Dr. Hutson learned that, approximately a month after he left Lakeside, the Defendant was hospitalized at Saint Joseph Hospital in Memphis. The Defendant subsequently was transferred from Juvenile

Court custody to another facility in Pennsylvania. Asked about his analysis of the Defendant's adaptive functioning, Dr. Hutson testified, "I didn't do a formal evaluation of that. One of the problems with [the Defendant] is he's really never functioned outside of an institutional environment for a year or more at a time since he's been an adolescent."

Asked specifically if the Defendant was "retarded," Dr. Hutson answered, "He fits in the Borderline Range between normal and retarded." Dr. Hutson added:

> I do think it's important for the Court to know that I consider [the Defendant] as competent to proceed. His strengths are he does have the ability to converse with you as long as the language isn't too abstruse, or if you explain things in simple terms he does get it. He does understand his charges. He understands the potential consequences that may result from a conviction of these charges.

> If he's impaired anywhere it's his understanding of the judicial process. But you can explain the roles of the different players, and he does grasp that.

On cross-examination, the prosecutor asked, "if it's a yes or no answer, the answer to the question about is [the Defendant] retarded is no, he is not retarded?" Dr. Hutson replied, "That's correct." Dr. Hutson also reviewed two pages of a Confidential Report of Psychological Evaluation from Saint Joseph Hospital that indicated that the Defendant had retaken the same I.Q. test several weeks after he took the test at Lakeside. The pages Dr. Hutson reviewed indicated a full scale score of 84. Dr. Hutson explained the higher score: "you can probably expect a little bit of learning from having already been exposed to the test a couple of months prior to that."

The State adduced no proof at the pretrial hearing other than its cross-examination of Dr. Hutson.[5] At the conclusion of the hearing, the trial court denied the Defendant's motion to dismiss the death-penalty notice, noting that Dr. Hutson had opined that the Defendant "is not retarded." On appeal, the Court of Criminal Appeals agreed with the trial court, holding that the Defendant had failed to establish any of the three prongs set forth in the intellectual disability statute. See State v. Bell, No. W2012-02017-CCA-R3-DD, 2014 WL 2547721, at *38 (Tenn. Crim. App. May 30, 2014). The Defendant asserts that the courts below erred.

---

[5] The two pages shown to Dr. Hutson by the prosecutor were admitted for identification purposes only. Our references to the contents of the pages are based on Dr. Hutson's testimony about them.

12

## A. Standard of Review

A trial court's determination that a defendant is or is not intellectually disabled so as to be ineligible for the death penalty presents a mixed question of law and fact. See State v. Strode, 232 S.W.3d 1, 8 (Tenn. 2007). While the trial court's findings of fact on this issue are binding on this Court unless the evidence preponderates otherwise, we review de novo the trial court's application of the law to those facts. See id.

## B. Significantly Subaverage General Intellectual Functioning

As set forth above, the first prong of the intellectual disability statute requires proof that the Defendant suffers from "[s]ignificantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below." Tenn. Code Ann. § 39-13-203(a)(1). This Court has made clear that a trial court's determination about a defendant's functional I.Q. is not limited to a consideration of his or her raw I.Q. test scores. See State v. Pruitt, 415 S.W.3d 180, 202 (Tenn. 2013); Keen v. State, 398 S.W.3d 594, 605 (Tenn. 2012); Smith v. State, 357 S.W.3d 322, 353-55 (Tenn. 2011); Coleman v. State, 341 S.W.3d 221, 241 (Tenn. 2011). Rather, we have determined that "trial courts may receive and consider *any* relevant and admissible evidence regarding whether the defendant's functional I.Q. at the time of the offense was seventy (70) or below." Coleman, 341 S.W.3d at 241 (emphasis added). Moreover, we have recognized that, "In formulating an opinion regarding a criminal defendant's I.Q. at the time of the offense, experts may bring to bear and utilize reliable practices, methods, standards, and data that are relevant to their particular fields." Id. at 242; see also Keen, 398 S.W.3d at 604-05. Those "practices, methods, standards, and data" may include a standard error of measurement ("SEM") applied to an individual's raw I.Q. test score. Coleman, 341 S.W.3d at 242 n.55. Therefore, if an expert witness testifying about a defendant's functional I.Q. customarily considers a particular test's SEM, the expert "should be permitted to base his or her assessment of the defendant's 'functional intelligence quotient' on a consideration of" the SEM. Id.; see also Keen, 398 S.W.3d at 605 n.11 (recognizing that, while "[t]here is an uncomfortable fit between SEM and Tennessee's statute, which contains a bright-line cutoff of 70[,] [n]evertheless, consideration of the SEM can aid a trial court as it weighs the various data concerning a particular defendant's mental acuity"). However, because of the statute's plain requirement that the defendant's I.Q. be no higher than 70, we have concluded that "an expert's opinion regarding a criminal defendant's I.Q. cannot be expressed within a range (i.e., that the defendant's I.Q. falls somewhere between 65 to 75) but must be expressed specifically (i.e., that the defendant's I.Q. is 75 or is 'seventy (70) or below' or is above 70)." Coleman, 341 S.W.3d at 242.

13

In this case, Dr. Hutson, the only expert to testify, stated that the Defendant's raw I.Q. score on the test administered at Lakeside was 77 with a seven-point SEM. While application of the SEM results in a score range of 70 to 84, Dr. Hutson opined that the Defendant was not "retarded" but that, instead, he "fits in the Borderline Range *between* normal and retarded." (Emphasis added). Asked bluntly by the prosecutor whether the Defendant was "retarded," Dr. Hutson testified that he was not. Significantly, at no point did Dr. Hutson opine that the Defendant's functional I.Q. was 70 or below.

The proof adduced by the defense in this case simply was not sufficient to establish by a preponderance of the evidence that the Defendant suffers from "[s]ignificantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below." Tenn. Code Ann. § 39-13-203(a)(1). Moreover, the defense failed to adduce any proof that the Defendant has deficits in adaptive behavior as required by the second prong of the intellectual disability statute. In sum, the defense failed to carry its burden of proving that the Defendant suffers from an intellectual disability that renders him ineligible for the death penalty. The Defendant is not entitled to relief on this basis.

## C. Constitutionality of the Intellectual Disability Statute

In a related issue, the Defendant contends that the intellectual disability statute, as interpreted by this Court, is facially unconstitutional in light of the United States Supreme Court's recent decision in Hall v. Florida, __ U.S. __, 134 S. Ct. 1986 (2014).

In Hall, the Supreme Court considered the Florida Supreme Court's interpretation of its state statute prohibiting the execution of intellectually disabled defendants. The Florida statute defined intellectual disability as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18." Hall, 134 S. Ct. at 1994 (quoting Fla. Stat. Ann. § 921.137(1) (2013)). The statute defined the term "significantly subaverage general intellectual functioning," as "performance that is two or more standard deviations from the mean score on a standardized intelligence test." Id. Interpreting this statute in a case that preceded Hall, the Florida Supreme Court "held that a person whose test score is above 70, including a score within the margin for measurement error, does not have an intellectual disability and is barred from presenting other evidence that would show his faculties are limited." Hall, 134 S. Ct. at 1994 (citing Cherry v. State, 959 So. 2d 702, 712-13 (Fla. 2007)).

Significantly, in Cherry v. State, the Florida Supreme Court refused to recognize the SEM as a consideration in whether the defendant's I.Q. score met the statutory cutoff. 959 So. 2d at 712-14. In Hall, the defendant presented proof of an I.Q. score of 71. 134

S. Ct. at 1992. "Florida argued that Hall could not be found intellectually disabled because Florida law requires that, as a threshold matter, Hall show an IQ test score of 70 or below before presenting any additional evidence of his intellectual disability." Id. "The Florida Supreme Court rejected Hall's appeal and held that Florida's 70-point threshold was constitutional." Id. Thus, when Hall's case came before it, the Florida Supreme Court would have permitted his execution "because he scored a 71 instead of 70 on an IQ test." Id. at 2001. Had the Florida Supreme Court considered the generally accepted SEM of five points, see id. at 1995, the defendant's I.Q. score would have fallen within the range of 66 to 76.

Overruling the Florida Supreme Court, the United States Supreme Court held as follows:

> [W]hen a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.
>
>         . . . .
>
> The Florida statute, as interpreted by its courts, misuses IQ score on its own terms; and this, in turn, bars consideration of evidence that must be considered in determining whether a defendant in a capital case has intellectual disability. Florida's rule is invalid under the Constitution's Cruel and Unusual Punishments Clause.

Id. at 2001.

Significantly, the United States Supreme Court did not hold that Florida's statute was unconstitutional on its face, but rather ruled unconstitutional the Florida Supreme Court's overly narrow interpretation of the statute. Id. at 1994 (stating that Florida's statute could be interpreted "[o]n its face" to pass constitutional muster). Florida's high court decided that, unless a defendant could adduce proof that he had a raw score of less than 71 points on an I.Q. test, regardless of the standard error of measurement, the defendant was barred from adducing other proof of his intellectual disability. It was this line of decisions and statutory interpretation that the United States Supreme Court overruled. See also Brumfield v. Cain, __ U.S. __, __, 135 S. Ct. 2269, 2277-78 (2015) (emphasizing that the determination of a capital defendant's functional I.Q. must take into account the standard error of measurement applicable to the defendant's raw I.Q. test scores).

15

Like Florida's statute, our statute does not require a trial court to take into account the standard error of measurement when evaluating a defendant's I.Q. test results. See Tenn. Code Ann. § 39-13-203. Moreover, we acknowledge that this Court previously has rejected the argument that an I.Q. score of seventy "should be interpreted, under our statute, to include a range of scores between sixty-five and seventy-five" based on an SEM of five points. Howell v. State, 151 S.W.3d 450, 457-58 (Tenn. 2004). However, in subsequent decisions, this Court has held that our statute "does not require a functional intelligence quotient *test score* of seventy (70) or below." Coleman, 341 S.W.3d at 241 (internal quotation marks omitted). Rather, we held in Coleman that the intellectual disability statute "does not require that raw scores on I.Q. tests be accepted at their face value and that the courts may consider competent expert testimony showing that a test score does not accurately reflect a person's functional I.Q. or that the raw I.Q. test score is artificially inflated or deflated." Id. at 224.

Thus, we have made clear that, "[i]n formulating an opinion regarding a criminal defendant's I.Q. at the time of the offense, experts may bring to bear and utilize reliable practices, methods, standards, and data that are relevant in their particular fields." Id. at 242. Specifically, unlike the Florida Supreme Court, we held in Coleman that "trial courts may receive and consider *any* relevant and admissible evidence regarding whether the defendant's functional I.Q. at the time of the offense was seventy (70) or below." Id. at 241 (emphasis added); see also Keen, 398 S.W.3d at 605 (reiterating that, "in determining whether a defendant's functional I.Q. is 70 or below, a trial court should consider *all* the evidence that is admissible under the rules for expert testimony") (emphasis added).

We continued in Coleman:

> Accordingly, if the trial court determines that professionals who assess a person's I.Q. customarily consider a particular test's standard error of measurement, the Flynn Effect, the practice effect,[6] or other factors affecting the accuracy, reliability, or fairness of the instrument or instruments used to assess or measure the defendant's I.Q., an expert should be permitted to base his or her assessment of the defendant's 'functional intelligence quotient' on a consideration of those factors.

341 S.W.3d at 242 n.55 (footnote added); see also Pruitt, 415 S.W.3d at 202 (emphasizing that "raw I.Q. scores are not the final determinant of a criminal defendant's intellectual functioning" and that our statute "does not require raw test scores to be

---

[6] "The Flynn Effect refers to the observed phenomenon that I.Q. test scores tend to increase over time. . . . The practice effect refers to increases in I.Q. test scores that result from a person's being retested using the same or a similar instrument." Coleman, 341 S.W.3d at 242 n.55.

accepted at face value." Rather, "[c]ourts may consider competent expert testimony that a particular test score does not accurately reflect a person's functional I.Q. or that the raw score is artificially inflated or deflated.").

Thus, unlike the Florida Supreme Court, we have not interpreted our statute to bar the presentation of other proof of a defendant's intellectual disability in the event that the defendant cannot produce a raw I.Q. test score of less than 71. Accordingly, we deem our statute, as currently interpreted, to be constitutionally sound under the Eighth Amendment. The Defendant is not entitled to relief on this basis.

## II. Denial of Two Motions for Mistrial

The State's second witness during the guilt/innocence phase of the trial was Belinda Bell, the Defendant's mother. Early in her testimony, after the prosecutor established that Bell lived at 7612 Richardson Landing Road, the following colloquy ensued:

Q. Now, back in June 2010 who lived with you?

A. Me and my three boys.

Q. Okay. And among those three boys was [the Defendant], correct?

A. [The Defendant], correct.

Q. Now, in June of 2010, and listen carefully to my question. In June of 2010 how long had [the Defendant] lived there? When had he moved in with you before June of 2010?

A. Well, he came—he came to me in February after—after—after prison, in February, the 20th.

After a few more questions, the defense moved for a mistrial on the basis that Bell's reference to the Defendant's previous location "was extraordinarily prejudicial . . . , that he had only lived [at home] three months from prison." The trial court denied the Defendant's motion, noting that the State had not elicited that information. The defense declined the trial court's offer of a curative instruction.

Toward the end of the State's case-in-chief, during Husband's testimony, the State asked Husband if he knew the Defendant in June 2010. Husband responded affirmatively, and the prosecutor asked, "And how did you know him?" Husband

17

replied, "His brothers had actually worked for me once or twice, and I knew his—well, I met his mom once, but I knew him from around the corner. And my son came to me and told me that he was, you know, just got out of jail—" The defense objected and moved for a mistrial, emphasizing that "this is the second reference to his prior criminal history." The trial court denied the motion for mistrial and instructed the jury to ignore the question and response.

The Court of Criminal Appeals concluded that the trial court had not abused its discretion in denying either motion for mistrial. See Bell, 2014 WL 2547721, at *43. The Defendant renews his argument in this Court.

## A. Standard of Review

"The law is well-settled that the decision of whether or not to enter a mistrial rests within the sound discretion of the trial court. This Court will not interfere with the trial court's decision absent a clear abuse of discretion on the record." State v. Reid, 91 S.W.3d 247, 279 (Tenn. 2002). "Normally, a mistrial should be declared only if there is a manifest necessity for such action." State v. Saylor, 117 S.W.3d 239, 250 (Tenn. 2003). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The party seeking a mistrial has the burden of establishing its necessity. State v. Banks, 271 S.W.3d 90, 137 (Tenn. 2008).

## B. Analysis

The Defendant argues in his brief to this Court that, "[i]n a capital case such as this, proceeding with the trial after disclosure by a State witness—during direct examination—that [the Defendant] had previously been in prison was extremely prejudicial." We disagree that the Defendant is entitled to a mistrial on this basis.

This Court has recognized three nonexclusive factors that a reviewing court should consider when determining whether the trial court should have granted a mistrial because of inappropriate testimony before the jury: "(1) whether the State elicited the testimony, or whether it was unsolicited and unresponsive; (2) whether the trial court offered and gave a curative jury instruction; and (3) the relative strength or weakness of the State's proof." State v. Nash, 294 S.W.3d 541, 547 (Tenn. 2009) (citing State v. Smith, 893 S.W.2d 908, 923 (Tenn. 1994)).

18

In this case, the State did nothing to elicit the testimony from either witness about the Defendant's prior incarceration. The defense rejected the trial court's offer of a curative instruction after Bell's testimony. After Husband's remark, the trial court *sua sponte* told the jury to "ignore" Husband's testimony and to "[p]ut it out of your mind." We also note that the unsolicited testimony was very brief and included no information about the length of the Defendant's prior incarceration or the reason for it.

As to the third prong of the inquiry, we agree with the Court of Criminal Appeals that "the State's case against the [D]efendant was strong such that the jury would have convicted [him] in the absence of the improper testimony." Bell, 2014 WL 2547721, at *43. As set forth in more detail below, the Defendant's acknowledged presence at the victim's house shortly before her last known communication with anyone else; the Defendant's DNA on the handgun replica and a condom found in the same area as a branch on which were found hairs consistent with the victim's head hair; multiple blunt force injuries to the victim's head; and a trail from this scene leading to the area where the victim's body was found; all point very strongly to the Defendant as the perpetrator.

Accordingly, we hold that Bell's and Husband's brief references to the Defendant's prior incarceration did not preclude an impartial verdict and did not create a manifest necessity for a new trial. The Defendant is not entitled to relief on the basis that the trial court denied his two motions for a mistrial. See Smith, 893 S.W.2d at 923 (holding that trial court properly denied capital defendant's motion for mistrial after defendant's sister referred to defendant's having been in jail).

### III. Denial of Cross-Examination of Husband
### About Extramarital Affair

During his cross-examination of Husband, defense counsel attempted to establish that Husband was engaged in an extramarital affair with Rebecca Harris, his ex-wife, at the time the victim was murdered. The State objected on relevance grounds, and a jury-out hearing ensued. Defense counsel explained that the affair gave Husband a motive to kill, or have killed, the victim and also was relevant as impeachment evidence. The trial court permitted defense counsel to conduct a voir dire examination of Husband. Husband admitted that he was having an extramarital affair with Rebecca Harris during his marriage to the victim. The affair began in November 2009 and included five sexual encounters. Husband also admitted that he sent several text messages to Harris on the afternoon of the victim's murder with the goal of arranging a meeting later that night. Husband denied that he wanted to "get back with Rebecca."

During the prosecutor's voir dire examination of Husband, Husband stated that he told the police about the affair "immediately after." Defense counsel then questioned

Husband about the written statement that he gave to the police on June 2, 2010. Husband acknowledged that his written statement included no reference to the affair. Defense counsel also questioned Husband about the written statement he provided to the police on June 8, 2010. Husband acknowledged that his second written statement included no reference to the affair. Husband also testified that he could not remember the names of the persons in law enforcement that he told about the affair.

At the conclusion of Husband's voir dire examinations, the trial court ruled as follows:

> The Court is going to sustain the State's objection to this line of questioning for this reason: The Rules require that proof of another wrong or act has to go to credibility. It's not just a bad conduct, but to truthfulness or untruthfulness.
>
> And the Court doesn't believe this line of questioning, while the Court acknowledges it's conduct that might involve moral turpitude or certainly inappropriate conduct, does not go to truthfulness or untruthfulness or would aid the jury really in any way in determining the credibility of the witness. So the Court will sustain the objection with regard to this line of questioning.

When defense counsel inquired if the trial court's ruling was the same with regard to the admission of Husband's affair as proof of motive, the court responded, "He is not a criminal defendant. So you can certainly ask him the other questions that have to do with whether he committed a crime, whether he committed this crime, any of those type of questions."

The Court of Criminal Appeals held that the trial court erred in disallowing this line of questioning but concluded that the error was harmless beyond a reasonable doubt. Bell, 2014 WL 2547721, at *46-47. Before this Court, the Defendant contends that the trial court's ruling violated his constitutional right to present a defense and also erroneously deprived him of the right to impeach Husband's credibility. The State contends that the trial court committed no error in its ruling.

### A. Standard of Review

Generally, this Court reviews a trial court's rulings on evidentiary matters for an abuse of discretion. See, e.g., Banks, 271 S.W.3d at 116. A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases

20

its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. Id.

Defense counsel sought to introduce evidence of Husband's affair both as substantive proof supporting his defense that Husband murdered the victim and also as impeachment evidence. We first will examine the admissibility of this proof as substantive evidence.

## B. Husband's Affair as Proof that Husband Committed Murder

In this case, there was no eyewitness proof and no confession. The Defendant's defense was that someone else committed the murder. The Defendant's primary suspect in this regard was Husband.[7] Accordingly, the Defendant wanted to establish that Husband was having an affair in order to prove that Husband had a motive to kill (or have killed) the victim.

The United States Supreme Court has made clear that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)). This Court has recognized that this right to present a defense is "a fundamental element of due process of law." State v. Brown, 29 S.W.3d 427, 432 (Tenn. 2000) (quoting Washington v. Texas, 388 U.S. 14, 19 (1976)). "A proper defense includes the right to introduce evidence that someone other than the accused committed the crime." State v. Rice, 184 S.W.3d 646, 671 (Tenn. 2006); see also Holmes v. South Carolina, 547 U.S. 319, 329-31 (2006) (explaining that a state rule barring defense evidence of third-party guilt in a capital murder case denied the defendant a fair trial); State v. Powers, 101 S.W.3d 383, 394 (Tenn. 2003) (recognizing that "an accused is entitled to present evidence implicating others in the crime") (citing Sawyers v. State, 83 Tenn. (15 Lea) 694, 695 (1885)). In Powers, we held that our Rules of Evidence 401 and 403 were adequate for determining the admissibility of proof of another's motive and opportunity to commit a murder. 101 S.W.3d at 394-95.

Tennessee Rule of Evidence 401 provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "In a criminal case, evidence that a third party had the motive and opportunity to commit the offense certainly would be relevant." Powers, 101 S.W.3d at 395. We agree with the Court of Criminal Appeals' observation in State v. Brock that a husband's extramarital affair "is suggestive of a motive for . . . murder" of the husband's

---

[7] The defense also adduced proof that Arcutt disliked the Defendant and was angry at him, permitting the inference that Arcutt had a reason to "frame" the Defendant for the victim's murder.

wife. 327 S.W.3d 645, 704 (Tenn. Crim. App. 2009); see also State v. Robinson, 73 S.W.3d 136, 152 (Tenn. Crim. App. 2001) (holding that husband's extramarital sexual conduct before he killed his wife was probative of motive). In short, proof of Husband's ongoing affair with Rebecca Harris was relevant to the Defendant's defense that Husband was responsible for the victim's murder.[8]

Nevertheless, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. We agree with the Court of Criminal Appeals' conclusion in this case that none of the criteria set out in Rule 403 justified excluding the proof of Husband's affair. See Bell, 2014 WL 2547721, at *46. Accordingly, we also agree with our intermediate appellate court's conclusion that the trial court erred when it refused to allow the defense to cross-examine Husband about his affair with Rebecca Harris. See id.

Although rulings about the admissibility of evidence generally do not rise to the level of constitutional error, Rice, 184 S.W.3d at 673 (citing Crane, 476 U.S. at 689), the erroneous exclusion of evidence that thwarts a criminal defendant's right to present a defense is constitutional error. Id.; see also, e.g., Brown, 29 S.W.3d at 436 (holding that "depriving the defendant of the right to present critical, reliable hearsay evidence of an alternative explanation for the injury is constitutional error"). To determine whether the erroneous exclusion of evidence violated a defendant's constitutional right to present a defense, we consider whether the excluded proof is critical to the defense; whether it bears sufficient indicia of reliability; and whether the interest supporting exclusion of the proof is substantially important. Rice, 184 S.W.3d at 673; see also United States v. Scheffer, 523 U.S. 303, 315 (1998) (recognizing that the exclusion of proof violates the constitutional right to present a defense when it "significantly undermine[s] fundamental elements of the defendant's defense").[9]

As to the latter two criteria, Husband admitted to his affair. Therefore, this proof bore sufficient indicia of reliability. The trial court's reasons for excluding the proof

---

[8] In its brief to this Court, the State contends that "any testimony regarding [Husband's] extramarital affair would scarcely have been probative of a motive to kill the victim." The State offers no citation in support of this proposition, which is contrary to reported Tennessee decisions.

[9] It is important to determine whether the erroneous exclusion of evidence rises to a constitutional violation because non-constitutional error is evaluated on the basis of whether it is "harmless" pursuant to Tennessee Rule of Appellate Procedure 36(b). See State v. Rodriguez, 254 S.W.3d 361, 371-72 (Tenn. 2008). Non-structural constitutional error, on the other hand, is presumed to entitle the defendant to a reversal unless the State demonstrates that the error was harmless beyond a reasonable doubt. See id. at 371.

22

were that it was not admissible as impeachment evidence under Tennessee Rule of Evidence 608 and that Husband was not a criminal defendant. While we agree with the trial court that this evidence was not admissible under Rule 608, see infra, Husband's status as a witness rather than as a criminal defendant was not a basis for excluding this proof. Moreover, the inadmissibility of proof for impeachment purposes is not a sufficient basis on which to exclude substantive proof of a criminal accused's defense to the crime for which he is being tried.

As to the first of these criteria, "whether excluded evidence is critical to a defense is a fact-specific inquiry." State v. Flood, 219 S.W.3d 307, 317 (Tenn. 2007). The specific facts of this case convince us that proof of Husband's extramarital affair was critical to the Defendant's defense that he did not commit the murder. Although motive is not an element of the crime of first degree murder, see Tenn. Code Ann. § 39-13-202 (2010), first degree murder trials frequently include proof from which a jury can infer why the accused killed the victim. For instance, a suspect robs a convenience store and, in order to eliminate the only witness, shoots and kills the cashier. Indeed, the Court of Criminal Appeals has recognized that, "[w]hile motive is not an element needed to be proven in order to support a conviction for [premeditated] murder, jurors often require such explanatory proof before they will convict an accused of this offense." Hawkins v. State, No. M2000-02901-CCA-R3-CD, 2002 WL 1768995, at *6 n.3 (Tenn. Crim. App. July 31, 2002), perm. appeal denied (Tenn. Dec. 9, 2002); see also State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004) (recognizing that "[e]vidence proving motive necessarily serves the purpose of completing the story of the crime" of first degree premeditated murder). While the State did not seek a conviction of premeditated murder in this case, the manner in which the victim was killed made clear that her death was not an unintended consequence that occurred during the course of another crime.

In this case, the State adduced no proof as to why the Defendant killed the victim. Although the State presented evidence that the Defendant thought that Husband had underpaid him by $50, the prosecutor asserted during his closing argument that the Defendant "did not kill Starr Harris because he was short $50 on his pay." Rather, the prosecutor contended, the victim's murder was "senseless."

In stark contrast to a senseless, motiveless murder, the Defendant proffered a different scenario: that Husband wanted the victim dead because he was engaged in an extramarital affair with his ex-wife. Proof of such a motive would have given the jury an opportunity to consider the possibility that it was Husband who killed, or had killed, the victim, and not the Defendant. Accordingly, under the unique facts and circumstances of this case, this proof was crucial to the Defendant's defense, and the trial court's erroneous exclusion of this evidence compromised the Defendant's constitutional right to present a defense.

23

Because of the trial court's violation of the Defendant's constitutional right to present a defense, the Defendant is entitled to a new trial unless we are convinced beyond a reasonable doubt, and on the basis of the entire record, that this error did not contribute to the jury's verdicts. See Rice, 184 S.W.3d at 672-73; see also Sullivan v. Louisiana, 508 U.S. 275, 279 (1993) ("The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error."); Chapman v. California, 386 U.S. 18, 24 (1967) (holding that, "before a federal constitutional error can be held harmless, the [reviewing] court must be able to declare a belief that it was harmless beyond a reasonable doubt"); State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) ("The test used to determine whether a non-structural constitutional error is harmless is 'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'") (quoting State v. Allen, 69 S.W.3d 181, 190 (Tenn. 2002)) (internal quotation marks omitted); Momon v. State, 18 S.W.3d 152, 168 (Tenn. 1999) (recognizing that "the goal of [constitutional] harmless error analysis is to identify the actual basis on which the jury rested its verdict") (citing Sullivan, 508 U.S. at 279).[10] Factors we consider in determining whether the erroneous exclusion of defense proof was harmless beyond a reasonable doubt include (1) the importance of the proof to the defense's case; (2) the extent to which the excluded proof was cumulative; (3) the extent of other evidence corroborating or contradicting the excluded proof; and (4) the overall strength of the State's case. See Momon, 18 S.W.3d at 168 (considering harmlessness of trial court's erroneous denial of defendant's right to testify). We hold that the Defendant is not entitled to relief on this basis.

First, although defense counsel was unable to question either Husband or Rebecca Harris about their affair, the defense was successful in alerting the jury to its theory that Husband was responsible for the victim's murder. Indeed, Husband testified during cross-examination, "I would think that I was the prime suspect, probably would be a

_____

[10] Numerous prior decisions of this Court describe constitutional harmless error review as the State having "the burden of proof" to "prove" on appeal that the error was harmless beyond a reasonable doubt. See, e.g., State v. Jackson, 444 S.W.3d 554, 591 n.50 (Tenn. 2014) (referring to State's "burden of proving unconstitutional prosecutorial comment or argument harmless beyond a reasonable doubt"); State v. Nagele, 353 S.W.3d 112, 117 (Tenn. 2011) (referring to State's "burden of proving harmless error"); Ward v. State, 315 S.W.3d 461, 476 (Tenn. 2010) ("Where, as here, the trial court has committed constitutional error . . . , the judgment of conviction must be set aside unless the State proves that the error was harmless beyond a reasonable doubt"); Momon, 18 S.W.3d at 167 ("Once a constitutional error has been established, . . . the burden is upon the State to prove that the constitutional right violation is harmless beyond a reasonable doubt."). The use of the terms "burden of proof" and "prove" in this context are unfortunate because no litigant can offer proof on appeal. More precisely, because constitutional error is presumed to entitle the defendant to a new trial, the State bears the burden of rebutting this presumption by persuading the reviewing court that a trial court's constitutional error was harmless beyond a reasonable doubt, based on all of the proof properly admitted at trial and contained in the record on appeal.

prime suspect from other people's view."  Later, during closing argument, the defense highlighted Husband's concern during the trial that the hairs found in the victim's hand were his; that he had scratches on his hands and arms at the relevant time; that he never produced the photographs he claimed to have taken on the afternoon of June 1; that the police did not confiscate his boots to be tested for the victim's blood; and that only his DNA was found on the victim's body.  Defense counsel also stated the following:  "[O]ne of Mr. Harris's actions that is questionable at best are [sic] his repeated text messages to his ex-wife.  And as he testified yesterday those text messages were not work related. . . . If [Mr. Harris] care[d] so deeply about [the victim], why [was he] texting [his] ex-wife?"  This rhetorical question, combined with Husband's admissions that he was speaking with his ex-wife during the trial and that others would likely view him as the "prime suspect," was sufficient to alert the jury to the defense theory that all was not right between Husband and the victim.

Second, as set forth in more detail below, the proof in this case points to the Defendant and the Defendant alone as the victim's killer. While Husband had scratches on his hand and arm on the day of the murder, there was no proof that the victim had Husband's DNA under her nails.  While there was proof that Husband had had sex with the victim, there was no proof that the contact was nonconsensual.  Multiple witnesses placed Husband at a location miles away from the House between 1:30 p.m., the time of the victim's last known phone conversation, and the discovery of her body later that evening.  Specifically, Ray Horne testified that he left the House with Husband and Son in the same vehicle and that the three of them drove to Munford Tire, arriving between 11:00 a.m. and noon.[11]  There, they arranged for some tire work to be done.  Josh Harris joined them.  The four men walked to a nearby restaurant and ate lunch together.  After lunch, and after waiting together at Munford Tire for the work to be finished, the four men left together to begin work on several properties.  The four men stayed together in the same work crew until early evening when Husband learned that there was a possible problem at the House.   Son testified consistently with Horne about Husband's whereabouts on June 1, 2010.  Logan Tate, the manager of Munford Tire, testified that Husband and his work crew arrived at Munford Tire before lunch on June 1, 2010.  The work that they had to do for Husband took "[a] few hours."  Husband was at Munford Tire when the work was finished. Tate also saw Husband during the course of the work because Husband was concerned about how long the work was taking.  Thus, multiple witnesses gave uncontroverted testimony that Husband was miles from the House from late morning on the day of the murder through the time Husband received the phone call informing him that the victim was missing.

---

[11] Ray Horne was no longer employed by Husband at the time of trial.

25

Of course, it is theoretically possible that Husband arranged for someone else to kill the victim. However, the record is devoid of any proof that Husband did so. Moreover, the record contains no proof suggesting that someone other than the Defendant struck and strangled the victim.[12] On the other hand, the proof implicating the Defendant as the victim's assailant was strong: undisputed proof placed the Defendant near the House and the victim at approximately 1:30 p.m. on the day in question; the victim was never heard from by anyone else after 1:30 p.m.; the handgun replica and the condom, both bearing DNA consistent with the Defendant's, were located near a branch bearing hairs consistent with the victim's head hair; these latter items were found not far from the victim's body; and the victim had suffered blunt force injuries to her head. Based on this and the remaining proof in the record, we are convinced beyond a reasonable doubt that the jury would have convicted the Defendant of murdering the victim even had the jury been informed about Husband's affair.

"[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986); see also, e.g., State v. Cook, 816 S.W.2d 322, 326 (Tenn. 1991) (recognizing that constitutional errors do not require reversal "if the reviewing court determines that the constitutional error was harmless beyond a reasonable doubt in light of the entire record"). The entire record in this case includes the testimony of multiple witnesses establishing an uncontroverted alibi for Husband. This evidence is critical in determining whether the trial court's error in excluding proof of Husband's affair was harmless beyond a reasonable doubt.[13]

---

[12] We acknowledge that Sp. Agent Sullivan observed scratches on Husband's arm and hand. However, Husband had spent the latter part of the day doing yard work for his business. Sp. Agent Sullivan's uncontroverted explanation that Husband's injuries were consistent with yard work combined with Husband's three-witness alibi of being miles from the site of the victim's murder between her last phone conversation at 1:30 p.m. and the time her body was found allow us to conclude that there was "no proof" that he physically participated in killing her.

[13] The dissent emphasizes that the Defendant's conviction is based on circumstantial evidence. Ever since this Court's opinion in State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011), this Court repeatedly has held that circumstantial evidence is no different than direct evidence for purposes of establishing guilt and is to be analyzed under the same standard as direct evidence, regardless of whether the case involves a sentence of death. See, e.g., State v. Hall, 461 S.W.3d 469, 501-02 (Tenn. 2015) (capital case); State v. Freeland, 451 S.W.3d 791 app. at 824 (Tenn. 2014) (capital case); State v. Sexton, 368 S.W.3d 371, 399 (Tenn. 2012) (capital case).

Moreover, we emphasize:

> The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.

Van Arsdall, 475 U.S. at 681 (citation omitted). "Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it." Id. (quoting R. Traynor, The Riddle of Harmless Error 50 (1970)).

The basis on which the jury actually rested its verdict in this case consisted of the physical proof linking the Defendant to the fatal attack on the victim and the uncontroverted proof placing Husband miles away from the victim at the relevant time.[14] Thus, although we have acknowledged the importance of the affair to the Defendant's defense, and although there was no actual direct proof admitted into evidence regarding Husband's extramarital conduct, the overall strength of the State's case results in our conclusion that the trial court's erroneous exclusion of proof about Husband's affair was harmless beyond a reasonable doubt.

Accordingly, the Defendant is not entitled to relief on this basis.

### C. Proof of Husband's Affair as Impeachment Evidence

Defense counsel sought to impeach Husband with proof about the affair in two distinct ways. First, the defense argued that Husband's extramarital conduct was probative of his character for truthfulness. See Tenn. R. Evid. 608(b). Second, defense counsel wanted to demonstrate that, while Husband claimed on the witness stand during voir dire to have informed the police about the affair, Husband's written statements to the police included no reference to it, allowing the inference that Husband was lying on the witness stand. See Tenn. R. Evid. 613.

### 1. Tennessee Rule of Evidence 608(b)

Tennessee Rule of Evidence 608(b) provides that a party may inquire during cross-examination about the witness' "[s]pecific instances of conduct" when those instances of conduct are "probative of truthfulness or untruthfulness." Tenn. R. Evid.

---

[14] The dissent places emphasis on the lack of a definitive time of death of the victim. The more relevant time is when the attack took place, not the actual time of death. Additionally, the body was already in a state of early decomposition when it was found, indicating that the victim had been dead for some time.

608(b).[15]  As noted by the Court of Criminal Appeals in this case, Bell, 2014 WL 2547721, at *45, our Court of Appeals has held that a witness' involvement in an extramarital affair is not probative of his or her truthfulness under the precursor to Rule 608(b).  See Bull v. Fey, No. 87-367-II, 1988 WL 72408, at *2 (Tenn. Ct. App. July 13, 1988) (citing State v. Morgan, 541 S.W.2d 385, 388 (Tenn. 1976) (adopting Federal Rule of Evidence 608(b)).  Additionally, while not referring specifically to Federal Rule 608, the Court of Criminal Appeals has held that "[e]vidence of non-commercial, non-felonious and private sex acts will not impeach or discredit a witness's testimony and such evidence is not admissible for that purpose."  Walden v. State, 542 S.W.2d 635, 637 (Tenn. Crim. App. 1976) (citing Merriman v. State, 71 Tenn. 393 (1879)).[16]

Other courts construing comparable rules of evidence are in accord.  See, e.g., Robinson v. Canon USA, Inc., No. 99-0339-CV-W-3, 2000 WL 564203, at *2 (W.D. Mo. Apr. 6, 2000) (holding that evidence of plaintiff's extramarital affairs had no bearing on her character for truthfulness under Federal Rule of Evidence 608(b)[17]); Mullins v. State, No. CA CR 88-267, 1989 WL 64190, at *3 (Ark. Ct. App. June 14, 1989) (holding that, under Arkansas Rule of Evidence 608(b)[18] past sexual activity was not relevant to the witness' character for truthfulness absent a prior false statement regarding the conduct).

We agree with this analysis.  An extramarital affair, in and of itself, is not necessarily probative of the adulterer's truthfulness.[19]  A straying spouse may be participating in his or her affair after fully informing the other spouse.  Indeed, in this matter, the defense did not question Husband about what, if anything, he told the victim about his relationship with Rebecca Harris.[20]  We hold that Husband's affair with

---

[15] Before permitting cross-examination about conduct probative of truthfulness, the trial court must, upon request, hold a jury-out hearing to determine "that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry."  Tenn. R. Evid. 608(b)(1).  Other procedural requirements also may need to be met.  See id. 608(b)(2), (b)(3).

[16] Morgan was filed mere days before Walden was filed.

[17] Federal Rule of Evidence 608(b) provides that witnesses may be cross-examined about specific instances of conduct "if they are probative of the character for truthfulness or untruthfulness of . . . the witness."  Fed. R. Evid. 608(b)(1).

[18] Arkansas Rule of Evidence 608(b) provides that witnesses may be cross-examined about specific instances of conduct for impeachment purposes "if probative of truthfulness or untruthfulness."

[19] Our holding should not be construed as precluding a finding of probative value under appropriate circumstances.

[20] During the jury-out hearing, defense counsel asked Husband, "And you knew that you weren't

Rebecca Harris was not probative of his truthfulness for purposes of Rule 608(b). Accordingly, the trial court did not err when it refused to allow the impeachment of Husband on this basis.

## 2. Tennessee Rule of Evidence 613

The defense also wanted to cross-examine Husband about the affair in order to demonstrate that he had not told the police about it although he testified during voir dire that he had. That is, the defense wanted to establish that Husband's testimony was inconsistent with his prior statements.

A prior statement by a witness that is inconsistent with his trial testimony is valuable impeachment evidence, and our Rules of Evidence provide for the introduction of prior inconsistent statements for impeachment purposes. See Tenn. R. Evid. 613; see also State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000) ("Our cases have consistently held that a prior inconsistent statement is admissible under the Rules of Evidence when the prior statement is used to impeach the credibility of a witness."). Our first task, then, is to determine whether Husband's written statements to the police, which contained no reference to Husband's affair, were "inconsistent" with his voir dire testimony that he told the police about the affair.

This Court recently has held that facts included in a prior statement may render the prior statement "inconsistent" when the witness' current testimony omits those facts. See State v. Davis, __ S.W.3d __, __, No. W2011-01548-SC-R11-CD, 2015 WL 3504853, at *11 (Tenn. June 3, 2015). The reverse also may be true. In this case, Husband testified at trial that he told the police about the affair. However, Husband also acknowledged that his prior two written statements to the police omitted any mention of the affair. We hold that Husband's written statements to the police were prior inconsistent statements for the purposes of Tennessee Rule of Evidence 613. Accordingly, the trial court erred when it denied defense counsel the opportunity to question Husband about the discrepancy between his testimony about what he told the police and the written statements that he provided to the police.[21]

This Court has recognized that the "undue restriction" of a criminal defendant's right to impeach witness credibility "may violate a defendant's right to confrontation

---

supposed to run around on [the victim], right?" Husband answered, "Yes, sir." Defense counsel then asked, "But you did so anyway, right?" Husband responded, "Done so all my life."

[21] Defense counsel did not attempt to introduce Husband's written statements into evidence. Accordingly, the provisions of subsection (b) of Rule 613, dealing with the admissibility of extrinsic evidence of prior inconsistent statements, are not implicated in this appeal.

under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution." State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001) (citing State v. Smith, 893 S.W.2d 908, 924 (Tenn. 1994); State v. Black, 815 S.W.2d 166, 177 (Tenn. 1991)). However, even applying the constitutional error standard of review, we have no difficulty in concluding that the trial court's erroneous refusal to allow defense counsel to cross-examine Husband about his prior inconsistent statements to the police does not entitle the Defendant to relief.

Husband's alibi was established by several other witnesses and, as noted above, there was absolutely no proof (other than motive) tying Husband to the victim's murder, either by his own hands or through the actions of another. Husband's testimony could have been entirely discredited with no significant impact on the prosecution's case. Cf. United States v. Hurn, 368 F.3d 1359, 1363 & n.1 (11th Cir. 2004) (recognizing that, under the "closely related" federal Compulsory Process and Due Process guarantees, "a defendant generally has the right to introduce evidence that is not itself tied to any of the elements of a crime or affirmative defense, but that could have a substantial impact on the credibility of an *important* government witness") (emphasis added). Accordingly, because we are convinced beyond a reasonable doubt that the exclusion of this evidence for impeachment purposes had no impact on the jury's verdicts, we hold that the Defendant is not entitled to relief on this basis.

*IV. Sufficiency of the Evidence*

The Defendant contends that the evidence was not sufficient to sustain any of his convictions. See Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions . . . shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."). Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id.

30

This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, this Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id. at 380-81.

### A. First Degree Felony Murder During Kidnapping

Our criminal code defines first degree murder as including "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping." Tenn. Code Ann. § 39-13-202(a)(2). "Kidnapping is false imprisonment as defined in § 39-13-302, under circumstances exposing the other person to substantial risk of bodily injury." Id. § 39-13-303(a) (2010). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id. § 39-13-302(a) (2010).

The proof in this case was sufficient to allow the jury to conclude that some sort of altercation occurred with the victim in the House, that the victim left the House by the back door, and that the victim subsequently was killed. A handgun replica found near a branch bearing hairs consistent with the victim's head hairs permitted the jury to infer that the victim left the house after being threatened with what she perceived to be a deadly weapon. Under our standard of review, this proof was sufficient to support the jury's conclusion that the victim was killed after being forced to leave her residence. Indeed, the Defendant does not contend that the evidence was not sufficient to support the elements of first degree felony murder during the perpetration of a kidnapping. Rather, he argues that the proof was not sufficient to establish that he was the perpetrator of this crime.

Of course, the perpetrator's identity is an essential element of every criminal offense. See Rice, 184 S.W.3d at 662 (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). Whether the Defendant was the perpetrator of the felony murder of the victim during the perpetration of a kidnapping was a question of fact for the jury upon its consideration of all competent proof. See State v. Thomas, 158 S.W.3d 361 app. at 388 (Tenn. 2005).

Proof of the Defendant's identity as the perpetrator was entirely circumstantial. The Defendant did not confess, and there were no third-party eyewitnesses. There was no physical evidence directly establishing that it was the Defendant who bludgeoned and

31

strangled the victim. Nevertheless, the circumstantial proof establishing the Defendant as the perpetrator was very strong. The Defendant admitted to being with the victim at the House and to speaking with Husband there after the victim dialed the landline phone and handed the headset to him. This phone call took place at 1:10 p.m. The victim sent her last text message to Block at 1:25 p.m. The victim spoke on the phone with Johnnie Phelps at 1:30 p.m. At 2:16 p.m., a FedEx employee delivered a package to the House and knocked loudly at the front door. No one answered. This proof permitted the jury to infer that the victim was abducted and assaulted between 1:30 p.m. and 2:16 p.m. The Defendant told Lt. Nessly that he left the House at approximately 1:30 p.m. on June 1, 2010. Tommy Redditt observed the Defendant in the immediate vicinity of the House at 1:30 p.m.

Later that evening, McKell arrived home from work and discovered that the furniture in the area where the victim worked was in disarray and the back door was open. In an area behind the House, a branch was found bearing hairs that were consistent with the victim's. In the same (assault) location, a condom and the handgun replica were found, both of which bore DNA consistent with the Defendant's. There was semen in the condom. A "drag trail" led from the assault location to the place where the victim's body was found. The victim suffered from multiple blunt traumas and strangulation.

This evidence permitted the jury to infer that, brandishing the handgun replica as a deadly weapon, the Defendant abducted the victim from her house after an encounter that left the victim's office in disarray, took the victim to the assault location where the branch, handgun replica, and condom later were found, engaged in some sexual activity that resulted in the Defendant's ejaculating inside the condom, and struck the victim in the head with the branch. Other injuries that the victim suffered suggest that the Defendant also may have kicked and stomped the victim. The Defendant inflicted sufficient injuries upon the victim to result in her death, although the record does not establish if all of these injuries were inflicted before she was dragged to the second (final) location.

The Defendant argues that his mother's testimony established that he was home at 2:00 p.m. on June 1, 2010, thereby proving that he did not have enough time to commit the kidnapping and murder of the victim. He also argues that his lack of injuries on June 1, 2010, belied his participation in any struggle with the victim.

However, even assuming that the jury found the Defendant's mother's testimony credible, the Defendant had ample time to commit these offenses. Assuming that the Defendant did not accost the victim until 1:35 p.m., five minutes after the victim spoke with Johnnie Phelps over the landline phone, and was home at 2:00 p.m., the Defendant had twenty-five minutes in which to engage in an altercation with the victim in the

House, abduct and force her to the assault location, engage in some sexual activity, kill or incapacitate the victim, drag her body to the final location, perhaps inflict additional injuries, and return home. Agent Sullivan testified that the Defendant could have walked home from the second location in seven minutes and thirty seconds.[22] Accordingly, even assuming the Defendant walked rather than ran home from the final location, he still had over fifteen minutes in which to abduct the victim, engage in some sexual activity, kill the victim, and hide the victim's body.

Likewise, the fact that the Defendant exhibited no physical injuries on the evening of the murder does not exonerate him. The police found the handgun replica at the assault location. This permitted the jury to infer that the Defendant forced the victim to accompany him to the assault location by displaying this item as a deadly weapon. The Defendant would not have needed to touch the victim in order to accomplish the abduction. Moreover, they jury could reasonably have inferred that the Defendant struck the victim in the head with the branch and incapacitated her soon after they reached the assault location, thereby avoiding any injuries to himself during his infliction of subsequent injuries to her. That the victim suffered a detached thumb nail does not prove that she touched the Defendant with that nail. It is entirely possible that the nail was detached while she was trying to fend off blows from the branch or as she was being dragged from the assault location to the final location. It is also noteworthy that the Defendant was wearing different clothes after he returned home than he had worn to the House and that there were wet clothes in the Defendant's washing machine.

Under our standard of review for challenges to the sufficiency of the evidence, we hold that the proof was more than sufficient to support the Defendant's conviction of first degree felony murder during the perpetration of a kidnapping. Accordingly, the Defendant is entitled to no relief on this basis.

### B. First Degree Felony Murder During Rape

Our criminal code also defines first degree murder as including "[a] killing of another committed in the perpetration of *or attempt to perpetrate any* . . . rape." Tenn. Code Ann. § 39-13-202(a)(2) (emphasis added). Rape, in turn, is defined as including the "unlawful sexual penetration of a victim by the defendant" and "[f]orce or coercion is used to accomplish the act." Id. § 39-13-503(a)(1) (2010). The Defendant contends that the evidence was not sufficient to establish that he raped the victim because her DNA was not found on the outside of the condom and his DNA was not found on or in the victim's body. However, the medical examiner testified that the victim's body had blunt force injuries to her inner thighs. When the victim was found, her shirt was torn open

---

[22] One of Husband's neighbors and employees testified that there was another route between the woods behind the House and a location near the Defendant's house that could be run in thirty seconds.

and her bra was pulled down, exposing her chest. This evidence, combined with the Defendant's semen contained by the condom left at the assault location, permitted the jury to infer that the Defendant intended to penetrate the victim and that he at least attempted some sexual activity with her. The first degree felony murder statute does not require that the perpetrator consummated the rape but only that he killed the victim in conjunction with attempting a rape.[23]

For these and the reasons set forth above, we hold that the evidence was more than sufficient to support the Defendant's conviction of first degree felony murder during the perpetration of a rape. The Defendant is entitled to no relief on this basis.

## C. Especially Aggravated Kidnapping

Our criminal code defines especially aggravated kidnapping as false imprisonment, defined above, "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon," or "[w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-305(a)(1), (a)(4) (2010). For the reasons set forth above, we hold that the evidence was sufficient to support the Defendant's conviction of especially aggravated kidnapping.

## D. Aggravated Sexual Battery

"Aggravated sexual battery is unlawful sexual contact with a victim by the defendant" and "[f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon" or "[t]he defendant causes bodily injury to the victim." Tenn. Code Ann. § 39-13-504(a)(1), (2) (2010). The "unlawful sexual contact" element of the offense "includes the intentional touching of the victim's . . . intimate

---

[23] Count 3 of the indictment alleged that the Defendant "did unlawfully and feloniously kill Starr Lynn Harris in the perpetration of rape, in violation of T.C.A. 39-13-202(a)(2) . . . ." The trial court instructed the jury that one of the essential elements of first degree felony murder was "[t]hat the killing was committed in the perpetration of *or the attempt to perpetrate* the alleged underlying felony" (emphasis added). The defense did not object to this instruction. We deem harmless any variance between the indictment and the proof adduced at trial, and the Defendant is entitled to no relief on this basis. See State v. Stokes, No. W2010-02622-CCA-R3-CD, 2012 WL 1656918, at *2-4 (Tenn. Crim. App. May 10, 2012) (defendant entitled to no relief from conviction of first degree felony murder alleged to have been committed during aggravated robbery when jury charged and proof demonstrated that murder was committed during attempted aggravated robbery), perm. appeal denied (Tenn. Aug. 15, 2012); State v. Walker, No. 02C01-9704-CC-00147, 1997 WL 746433, at *3 (Tenn. Crim. App. Dec. 3, 1997) (after defendant charged with felony murder during perpetration of robbery, jury instruction including attempt to perpetrate alleged robbery did not entitle defendant to relief because the instruction "did not provide the jury with different elements by which to convict the [defendant] of felony murder").

parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39-13-501(6) (2010). A victim's breasts and inner thighs are intimate parts. Id. § 39-13-501(2). A bruise is a bodily injury. Id. § 39-11-106(a)(2) (2010).

As set forth above, the proof established that the victim had bruises to her inner thighs and that a condom containing the Defendant's semen was found at the assault location. The victim's body was found with her shirt open and her bra pulled down around her waist. The handgun replica and a branch containing hairs consistent with the victim's head hair also were found at the assault location. This proof permitted the jury to infer that the Defendant and the victim both were at the assault location and that, using the handgun replica as a means of force or coercion, the Defendant intentionally touched the victim's inner thighs, causing bruising, and that he intentionally touched the clothing covering the victim's breasts. This proof also permitted the jury to infer that the Defendant intentionally touched the victim's thighs and clothing for the purpose of sexual arousal or gratification. Accordingly, the proof was sufficient to support the Defendant's conviction of aggravated sexual battery. The Defendant is not entitled to relief on this basis.

## V. Mandatory Review of Death Sentence

This Court is statutorily required to review the Defendant's death sentence. Tenn. Code Ann. § 39-13-206(a)(1) (2010, 2014). Our review includes analyzing whether (1) the death sentence was imposed in any arbitrary fashion; (2) the evidence supports the jury's findings of statutory aggravating circumstances; (3) the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances; and (4) the capital sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. Id. § 39-13-206(c)(1)(A)-(D).

## A. Imposition of Death Penalty

The Defendant contends in his brief to this Court that he is entitled to a new sentencing hearing because the trial court "fail[ed] to allow [him] to make a closing argument" at the conclusion of the proof offered during the sentencing hearing. The Defendant refers to Tennessee Code Annotated section 39-13-204(d) which provides that, in a capital sentencing proceeding, "the state shall be allowed to make a closing argument to the jury; and then the attorney for the defendant shall also be allowed such argument, with the state having the right of closing." Tenn. Code Ann. § 39-13-204(d).

After Belinda Bell finished testifying at the sentencing hearing, the trial court asked, "Any other witnesses?" Defense counsel responded, "No, Your Honor." The trial court then asked, "Does the State have anything else?" The prosecutor replied, "No, sir." The trial court then asked, "Does the defendant have anything else?" The transcript indicates that defense counsel "(Shakes head negatively.)" The trial court then proceeded to issue its charge to the jury, and defense counsel raised no objection.

We disagree that the trial court "failed to allow" defense counsel to make a closing argument. The trial court clearly gave defense counsel the opportunity to make a closing argument, which defense counsel declined. Moreover, defense counsel voiced no objection when the trial court began charging the jury. That the trial court did not expressly ask defense counsel to make a closing argument is without import. Defense lawyers in capital cases are required to be familiar with the courtroom procedures applicable to capital sentencing hearings. See Tenn. Sup. Ct. R. 13 § 3(c), (d). We are confident that defense counsel was well aware of his right to make a closing argument at the close of proof and that the trial court's question was adequate to inform him of that opportunity.[24]

The record indicates that defense counsel waived his opportunity to make a closing argument at the conclusion of the sentencing hearing. Accordingly, the Defendant is not entitled to relief on this basis.

## B. Sufficiency of Evidence Supporting Aggravating Circumstances

At the beginning of the sentencing hearing, the trial court told the jury that the two first degree murder convictions "merge[d]," but did not explain what the merger meant. With respect to the aggravating circumstances necessary for the imposition of a death sentence, the trial court instructed the jury as follows:

> Tennessee law provides that no sentence of death or imprisonment for life without the possibility of parole shall be imposed by a jury but upon a unanimous finding that the State has proven beyond a reasonable doubt the existence of at least one or more of the statutory aggravating circumstances, which shall be limited to the following:

---

[24] The report of this case filed pursuant to Tennessee Supreme Court Rule 12 provides that one of the Defendant's two trial lawyers was "certified as a criminal trial expert by National Board of Trial Advocacy" and that he had "represented 12 to 15 persons facing the death penalty prior to" representing the Defendant.

The defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; and/or

The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; and/or

The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit the kidnapping of Starr Harris; and/or

That the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit the rape of Starr Lynn Harris.

After deliberating for approximately thirty minutes, the jury returned a sentence of death after finding that the State had proven all four aggravating circumstances beyond a reasonable doubt. The Court of Criminal Appeals determined that two of these aggravating factors were not supported by the record, Bell, 2014 WL 2547721, at *52, 53, but nevertheless upheld the death sentence. Id. at * 57.

### 1. Prior Violent Felony

Our criminal code provides that one of the aggravating circumstances that may justify imposition of the death penalty is "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." Tenn. Code Ann. § 39-13-204(i)(2). This Court has construed the word "violence" as "physical force unlawfully exercised so as to injure, damage or abuse." State v. Fitz, 19 S.W.3d 213, 217 (Tenn. 2000). We also have held that, while pointing a deadly weapon at a victim is "violence," State v. Allen, 69 S.W.3d 181, 186 (Tenn. 2002), "[t]here remain purely verbal threats and conduct not rising to the level of violence that would place a person in fear." Id.

In support of the aggravating circumstance for a previous conviction of a felony whose statutory elements involve the use of violence to the person, the State introduced at the sentencing hearing a certified copy of a "judgment of sentence" from the Delaware County Court of Common Pleas in the Commonwealth of Pennsylvania. This document indicates that the Defendant was sentenced in November 1997 for robbery of a motor vehicle, aggravated assault, and recklessly endangering another person. The State introduced no other evidence concerning the Defendant's prior convictions.

37

Under Pennsylvania law, "[a] person commits a felony of the first degree if he steals or takes a motor vehicle from another person in the presence of that person or any other person in lawful possession of the motor vehicle." Commonwealth v. George, 705 A.2d 916, 918 (Pa. Super. Ct. 1998) (quoting 18 Pa. Cons. Stat. Ann. § 3702(a) in reference to offense committed in June 1996).[25] The Superior Court of Pennsylvania has construed this statute as "defin[ing] the crime of robbery of a motor vehicle, or carjacking, as the taking or exercise of unlawful control over a motor vehicle, from its lawful user, by force, intimidation or fear." George, 705 A.2d at 919. Thus, the Pennsylvania courts have concluded that this crime may be committed through intimidation or fear, neither of which necessarily involves violence to the person as this Court has construed that term.

As to the Defendant's previous conviction of aggravated assault under Pennsylvania law, the Pennsylvania statute defines aggravated assault as including *attempts* to cause bodily injury to another. See Commonwealth v. Lopez, 654 A.2d 1150, 1153-54 (Pa. Super. Ct. 1995) (quoting 18 Pa. Cons. Stat. Ann. § 2702(a)(1), (4) in reference to offense committed in 1993).[26] The Pennsylvania Superior Court has construed this statute as allowing a conviction for aggravated assault when the perpetrator shoots a gun into a vacant house, unaware that the occupant was not present. See Lopez, 654 A.2d at 1152. Clearly, the statutory elements of this crime do not necessarily involve the use of violence to the person.

Finally, Pennsylvania defines "recklessly endangering another person" as a misdemeanor. See 18 Pa. Cons. Stat. Ann. § 2705 (West, Westlaw through end of 2014 Reg. Sess.) (effective June 6, 1973). Accordingly, the Defendant's prior conviction of this crime does not support the application of the (i)(2) aggravating circumstance.

When the statutory elements of the prior felony of which a capital defendant has been convicted, in and of themselves, do not necessarily involve the use of violence to the person, the trial court "must necessarily examine the facts underlying the prior felony" in order to determine whether the (i)(2) aggravating circumstance may be considered by the jury. State v. Sims, 45 S.W.3d 1, 11-12 (Tenn. 2001). Because the State adduced no proof of the facts underlying the Defendant's prior convictions, the trial court could not, and did not, undertake this inquiry.[27] Accordingly, the trial court erred in

---

[25] This statute became effective in 1993. See H.B. 3, 177th Gen. Assemb., Reg. Sess. (Pa. 1993). The quoted provision remains unchanged. See 18 Pa. Cons. Stat. Ann. § 3702(a) (West, Westlaw through end of the 2014 Reg. Sess.).

[26] These provisions of the statute remain unchanged. See 18 Pa. Cons. Stat. Ann. § 2702(a)(1), (4) (West, Westlaw through end of the 2014 Reg. Sess.)

[27] Admissible proof of the facts underlying a defendant's prior felony convictions is limited in this context

allowing the jury to consider the (i)(2) aggravating circumstance, and the jury's use of this aggravating circumstance was invalid.

## 2. Felony Murder Aggravating Circumstance

Another aggravating circumstance which may permit the imposition of the death penalty is that

> [t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb[.]

Tenn. Code Ann. § 39-13-204(i)(7) (the "felony murder" aggravating circumstance). The trial court erred in its charge to the jury regarding the felony murder aggravating circumstance.

As recognized by the Court of Criminal Appeals below, the trial court divided this single aggravating circumstance into two separate aggravating circumstances. However, the felony murder aggravating circumstance may be applied only once to a single murder committed in the course of multiple felonies. See, e.g., State v. Henretta, 325 S.W.3d 112, 145-46 (Tenn. 2010) (considering the felony murder aggravating circumstance as a single aggravating circumstance although the murder occurred while the defendant was committing kidnapping, robbery, and rape); State v. Morris, 24 S.W.3d 788, 798-99 (Tenn. 2000) (considering the felony murder aggravating circumstance as a single aggravating circumstance when the murder occurred while the defendant was committing another first degree murder, rape, burglary, and kidnapping); State v. Buck, 670 S.W.2d 600, 608-09 (Tenn. 1984) (considering the felony murder aggravating circumstance as a single aggravating circumstance when the murder occurred while the defendant was committing rape, robbery, and kidnapping). While the evidence in this case supported the application of the felony murder aggravating circumstance as a *single* aggravating circumstance, the trial court's error impermissibly allowed the jury to apply twice a single aggravating circumstance.

---

to the records delineated in Shepard v. United States, 544 U.S. 13, 16, 20 (2005). See State v. Young, 196 S.W.3d 85, 112 (Tenn. 2006).

### 3. Heinous, Atrocious, and Cruel

Our criminal code also permits the imposition of the death penalty on the basis that the murder "was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5) (the "HAC" aggravating circumstance). Given Dr. Funte's testimony, there is no question that the victim's murder involved "serious physical abuse beyond that necessary to produce death." The evidence was sufficient to support the jury's application of the HAC aggravating circumstance.

### 4. Effect of Error

In this case, we conclude that two of the four aggravating circumstances applied by the jury were invalid. When a jury is allowed to consider invalid aggravating circumstances, this Court may not affirm the death sentence unless we determine, beyond a reasonable doubt, that the jury would have imposed the death sentence absent any consideration of the invalid aggravating circumstances. See State v. Howell, 868 S.W.2d 238, 259 (Tenn. 1993). In making this determination, we must

> completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed. These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator[s], and the nature, quality and strength of mitigating evidence.

Id. at 260-61.

As indicated above, the jury had before it two valid aggravating circumstances: *one* felony murder aggravating circumstance and the HAC aggravating circumstance. The proof in support of both of these aggravating circumstances was overwhelming. The prosecutor made no closing argument at the sentencing hearing. During his opening statement, he referred to the prior violent felony aggravating circumstance and told the jury that the Defendant had been convicted of robbery of a motor vehicle and aggravated assault in 1997 in Pennsylvania and that there was documentary proof of those convictions. The prosecutor also referred to the HAC aggravating circumstance, including a summary of Dr. Funte's testimony about the injuries the victim suffered. As to the felony murder aggravating circumstance, the prosecutor stated the following:

> The next two factors are really the same thing on different crimes; that the murder was knowingly committed by the defendant while the

40

defendant had a substantial role in committing kidnapping.

And this looks similar, of course, to the count which you've already found him guilty of; that is, the felony murder in perpetration of kidnapping. You've already found him guilty of that.

Now, this is up to you. This is your discretion. But I suggest to you, you've already found the defendant guilty of something at least very similar to that; that is, the murder was knowingly committed by the defendant while the defendant had a substantial role in committing kidnapping.

And the last one, the fourth factor for your consideration is similar; the murder was knowingly committed by the defendant while the defendant had a substantial role in committing rape.

And again, you've already found Rickey Bell guilty of that or in language very similar to that. I'm not going to belabor it. I'm not going to argue it. You've already done it. You have found that he was guilty of a murder or that he had a substantial role in committing rape and that Starr Harris died.

The only new evidence that the State adduced during the sentencing hearing was a stipulation regarding the Defendant's birthdate and the judgment document from the Pennsylvania court, both of which were admitted in support of the invalid prior violent felony aggravating circumstance. The mitigation evidence adduced at sentencing was de minimus.

Initially, we are constrained to express our concern that the defense put on so little mitigating proof. The technical record in this matter reflects that the defense obtained approval and funding for the services of a mitigation specialist. Moreover, although the defense had proof of the Defendant's low I.Q., defense counsel did not present this proof to the jury. We note that, during the oral arguments regarding this case held on March 4, 2015, defense counsel claimed that it was a strategic decision not to introduce certain mitigating proof because doing so would have allowed the State to inquire into the Defendant's behavior during his previous incarceration. It is unclear, however, how the prosecution could have made such inquiries of, for instance, Dr. Hutson.

Nevertheless, considering the record as a whole, we are convinced beyond a reasonable doubt that the jury would have sentenced the Defendant to death absent any consideration of the two invalid aggravating circumstances. As set forth in some detail above, the multiple injuries inflicted upon the victim were horrific. This Court has

41

upheld the death penalty when the proof supported the single aggravating circumstance of the infliction of serious physical abuse beyond that necessary to produce death. See, e.g., State v. Hall, 8 S.W.3d 593, 601 (Tenn. 1999) (defendant beat, strangled, and drowned victim). Indeed, this Court has upheld a death sentence imposed on the basis of the HAC aggravating circumstance even when the jury also applied a second invalid aggravating circumstance. See, e.g., Strouth v. State, 999 S.W.2d 759, 764, 767 (Tenn. 1999) (jury's reliance on invalid felony murder aggravating circumstance was harmless where jury applied valid aggravating circumstance that murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind). Moreover, the proof that the Defendant knowingly killed the victim after abducting her and during the course of a sexual assault was overwhelming.[28] Based on our analysis of the Howell factors, we conclude that the errors involving the aggravating circumstances were harmless beyond a reasonable doubt. Accordingly, we hold that the Defendant is not entitled to relief on the basis that the jury considered two invalid aggravating circumstances.

## C. Aggravating Circumstances Outweigh Mitigating Circumstances

We also are statutorily required to assess whether "[t]he evidence supports the jury's finding that the aggravating . . . circumstances outweigh any mitigating circumstances." Tenn. Code Ann. § 39-13-206(c)(1)(C). In this case, the only mitigation proof was the Defendant's mother's testimony, the sum total of which consisted of the following:

Q. Would you state your name for the record, please?

A. Belinda Joyce Bell.

Q. Ms. Bell, I know this is very hard. I want to ask you some questions. What is your relationship to [the Defendant]?

A. I'm his mother.

Q. Okay. And you love your son?

A. Very much.

Q. Have you always loved your son?

---

[28] "Knowingly" is defined in pertinent part as follows: "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2010).

42

A. I always did. I always will.

Q. And that was my next question. You always have and you always will, is what you said?

A. Yes, sir. Right.

Q. I want to ask you, does [the Defendant's] life have meaning to you?

A. For me being his mother, he mean the world to me. I would lay down my life for him. Who wouldn't? I'm a mother, you know what I'm saying?

Q. And would it hurt you to have to lose [the Defendant], to have [the Defendant] put to death?

A. Yes. Yes. It sure would. It really would.

Q. Can you even fathom that?

A. Huh?

Q. Can you even imagine that happening—

A. No.

Q. —and how you would feel as a result of that?

A. No, not in my biggest dream I wouldn't imagine that.

As we have set forth above, there was sufficient evidence in the record to support two of the four aggravating circumstances charged to the jury. The mitigation proof consisted of the Defendant's mother testifying that she loved her son and did not want to see him executed.[29] We hold that the record supports the jury's conclusion that the

---

[29] Although the defense put on no other proof of mitigating circumstances, the trial court, *at defense counsel's behest*, instructed the jury as follows:

> Tennessee law provides that in arriving at the punishment, the jury shall consider . . . any mitigating circumstance raised by the evidence, which shall include but not be limited to:
>
> Significant and detrimental effects from the parents' separation or divorce;

43

aggravating circumstances outweighed the mitigating circumstances. The Defendant is not entitled to relief on this basis.

## D. Proportionality Review

Finally, we are statutorily required to review the Defendant's sentence of death in order to determine whether it is excessive or disproportionate to the penalty imposed in similar cases. Our review is intended to determine whether the Defendant's death sentence is aberrant, arbitrary, or capricious insofar as it is "disproportionate to the punishment imposed on others convicted of the same crime." State v. Bland, 958 S.W.2d 651, 662, 665 (Tenn. 1997) (quoting Pulley v. Harris, 465 U.S. 37, 43 (1984)). Our review employs the precedent-seeking method of comparative proportionality review, in which we compare this case with other cases involving similar crimes and similar defendants.[30] The pool of cases into which we peer consists of "those first degree murder cases in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life imprisonment, life imprisonment without possibility of parole, or death." Rice, 184 S.W.3d at 679 (citing State v. Godsey, 60 S.W.3d 759, 783 (Tenn. 2001); Bland, 958 S.W.2d at 666).

While no crimes or defendants are identical, a death sentence is disproportionate if the case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Bland, 958 S.W.2d at 668. Thus, in our proportionality review, we examine "the facts and circumstances of the crime, the

---

treatment for depression; correlation of mental health problems to anger; denied continued relationship with father; rejection by stepmother; effects of strained parental relationships; low IQ; denied stable, loving environment; effects of juvenile transfer to out-of-state facility; lack of family contact during incarceration; turned to gang activity as a result of feelings of alienation and neglect; development of self worth was impaired by father's abandonment or perceived abandonment; lack of appropriate life skills or maturity to effectively make good choices and decisions; developed positive relationships following release; sought out and maintained employment; desire for normal family and effects of execution on family members; and any other reason that a juror may find not to impose the death penalty, even if it cannot be put into words.

This Court has made clear that a trial judge should instruct the jury on only those mitigating circumstances that have been raised by the evidence. See State v. Hodges, 944 S.W.2d 346, 353-55 (Tenn. 1997).

[30] The Defendant asks that we modify our methodology for conducting our proportionality review, contending that "the Bland method is flawed and unreliable" and "produces an unconstitutionally flawed result." This Court recently rejected the Defendant's argument and reaffirmed the Bland approach to proportionality review. See State v. Pruitt, 415 S.W.3d 180, 217 (Tenn. 2013). We decline the Defendant's invitation to overturn our decisions in either Bland or Pruitt.

characteristics of the defendant, and the aggravating and mitigating circumstances involved." State v. Stevens, 78 S.W.3d 817, 842 (Tenn. 2002). More specifically, we consider

> (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

Reid, 164 S.W.3d at 316 (citing Bland, 958 S.W.2d at 667). We also consider several factors about the Defendant, including his (1) record of prior criminal activity; (2) age, race, and gender; (3) mental, emotional, and physical conditions; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. Id. at 316-17.

In this case, the proof established that the Defendant went to the victim's home and asked to speak with Husband about his pay. By doing so, the Defendant established that Husband was not at home. The Defendant engaged in a short phone call with Husband at 1:10 p.m. Apparently, the Defendant then left, because the victim subsequently engaged in another phone call and some text messages. An eyewitness established that the Defendant returned to the House at approximately 1:30 p.m. He obtained admittance and some form of altercation ensued, during which the home office furniture was disturbed. The Defendant brandished the handgun replica at the victim and forced her to leave the House by the back door. The Defendant forced the victim to the assault area, where he struck the victim in the head with a branch. The Defendant also inflicted numerous other severe injuries on the victim, eventually killing her through a combination of blunt force trauma and strangulation. At some point during the assault, the Defendant engaged in some form of sexual activity with the victim. Either before or after killing her, the Defendant dragged the victim to another area in the woods and dumped her body. The victim was a thirty-seven-year-old wife and mother. There was no apparent motivation, provocation, or justification for her murder.

After killing the victim, the Defendant returned home and changed his clothes. When questioned, he denied assaulting the victim. The record contains no expression of remorse and no evidence that the Defendant might be rehabilitated. The Defendant is an African American who was thirty-three years old when he killed the victim. His parents were divorced when he was young, and he spent the majority of his adolescent and young adult years in institutional settings, including a mental hospital and boarding school.[31]

---

[31] We glean this information from Dr. Hutson's pre-trial testimony.

45

His I.Q. score at age fourteen was 77, described by Dr. Hutson as "borderline retarded." The Defendant has three previous convictions, all of which occurred in Pennsylvania more than ten years before he committed the instant crimes.

Based on our thorough review of the record and Supreme Court Rule 12 reports,[32] we conclude that the death sentence imposed in this case is not excessive or disproportionate when compared to the penalty imposed in similar cases. We have upheld the death sentence in numerous cases where the defendant beat and/or strangled a woman to death. See, e.g., State v. Faulkner, 154 S.W.3d 48 (Tenn. 2005) (defendant murdered victim by hitting her in the head and face with a skillet; prior violent felony aggravating circumstance); Hall, 8 S.W.3d at 593 (defendant murdered the victim by beating, strangling, and drowning her; HAC aggravating circumstance); State v. Cauthern, 967 S.W.3d 726 (Tenn. 1998) (defendant and co-defendant broke into victim's home and raped and strangled her; HAC aggravating circumstance); State v. Nichols, 877 S.W.2d 722 (Tenn. 1994) (defendant murdered woman by beating her in head with a piece of lumber during rape; prior violent felony aggravating circumstance; jury's application of invalid felony murder aggravating circumstance harmless beyond a reasonable doubt); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994) (defendant raped woman and murdered her by beating her head with a hammer; prior violent felony and HAC aggravating circumstances; jury's application of invalid felony murder aggravating circumstance harmless beyond a reasonable doubt); State v. Alley, 776 S.W.2d 506 (Tenn. 1989) (defendant abducted victim and took her into a park where he beat, strangled, and raped and stabbed her with a branch; HAC and felony murder aggravating circumstances); State v. Barber, 753 S.W.2d 659 (Tenn. 1988) (defendant beat woman in head with crescent wrench during home-invasion burglary; HAC and felony murder aggravating circumstances); State v. McNish, 727 S.W.2d 490 (Tenn. 1987) (defendant beat woman in head with vase; HAC aggravating circumstance); State v. Harbison, 704 S.W.2d 314 (Tenn. 1986) (defendant killed victim during home burglary by striking her on the head multiple times with a vase; felony murder aggravating circumstance).

This Court also has upheld a death sentence imposed on defendants who suffered from some mental disabilities or childhood issues. For instance, in State v. Odom, 336 S.W.3d 541 (Tenn. 2011), the defendant was convicted of first degree felony murder in the perpetration of rape. In mitigation, the defendant presented evidence that, at the age of fourteen, he was diagnosed with "a moderate to severe personality disturbance" and was determined to be reading at a second grade level. Id. at 551. He also presented evidence that he had been abandoned by his mother, abused and ridiculed by his adopted parents and grandmother, and spent a significant amount of time in state custody. Id. We

---

[32] Tennessee Supreme Court Rule 12 requires trial courts to file extensive reports in all cases in which the defendant is convicted of first degree murder. These reports include data about the crime, the defendant, and the punishment imposed. See Tenn. Sup. Ct. R. 12(1) and the appendix thereto.

upheld the death sentence imposed on the basis of the prior violent felony aggravating circumstance and the felony murder aggravating circumstance. Id. at 547-48.

In State v. Rollins, 188 S.W.3d 553 (Tenn. 2006), the defendant stabbed to death an elderly man. The defendant presented proof that his I.Q. fell within "the borderline defective range, slightly above mentally retarded"; that he could not read or write; that his mother was physically and mentally unwell; and that his parents were divorced while he was a child and that he had lived with his grandmother. Id. at 563. We upheld the death sentence on the basis of four valid aggravating circumstances found by the jury: the victim was over sixty-nine years old; the felony murder aggravating circumstance; the murder was committed to avoid prosecution; and the HAC aggravating circumstance. Id. at 564, 574.

In Rice, 184 S.W.3d at 646, the defendant was convicted of alternative counts of first degree premeditated and first degree felony murder for stabbing a thirteen year old girl to death. The defendant presented proof of a low I.Q. and that he "suffered a delusional and paranoid disorder." Id. at 678. This Court upheld the death sentence on the basis of two valid aggravating circumstances found by the jury: the HAC aggravating circumstance and the felony murder aggravating circumstance. Id. at 653, 677-78.

In State v. Middlebrooks, 995 S.W.2d 550 (Tenn. 1999), the defendant was convicted of first degree felony murder for participating in beating, cutting, stabbing, burning, and mutilating the fourteen-year-old male victim. The defendant presented proof that he suffered from "a severe borderline personality disorder" and brain impairment and that he had spent time in a children's home and in prison before age twenty-four. Id. at 555. His home life as a child was unstable and he was sexually abused. Id. This Court affirmed the defendant's death sentence on the basis of a single valid aggravating circumstance found by the jury, the HAC aggravating circumstance. Id. at 553.

In State v. Hines, 919 S.W.2d 573 (Tenn. 1995), the defendant was convicted of first degree felony murder for stabbing a woman to death. The defendant had also raped the woman. The defendant presented proof of "a troubled childhood" and that he suffered from self-destructive behavior, paranoid personality disorder, and chronic depression. Id. at 577. This Court affirmed the death sentence on the basis of two valid aggravating circumstances found by the jury: the prior violent felony and the HAC aggravating circumstances. Id. at 582 n.3, 584.

Based upon our close review of the entire record in this case, combined with our review of these and other cases in which the death penalty was imposed and upheld, we hold that the sentence of death imposed in this case for the brutal murder of Starr Harris

is not disproportionate to the penalty imposed for similar crimes under similar circumstances. The Defendant is entitled to no relief on this basis.

## **Conclusion**

For the reasons set forth above, we affirm the Defendant's convictions and sentence of death.[33]

The sentence of death shall be carried out as provided by law on the 18th day of October, 2016, unless otherwise ordered by this Court or other proper authority. It appearing that the Defendant Rickey Alvis Bell, Jr., is indigent, the costs of this appeal are taxed to the State of Tennessee.

_____
JEFFREY S. BIVINS, JUSTICE

---

[33] The Defendant has not challenged his other sentences.