IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 6, 2021

### STATE OF TENNESSEE v. STANLEY JEFFERSON

**Appeal from the Criminal Court for Shelby County**
No. 16-06454        **Chris Craft, Judge**

_____

### No. W2020-00578-CCA-R3-CD
_____

A jury convicted the Defendant, Stanley Jefferson, of aggravated rape, two counts of especially aggravated burglary, aggravated assault, and theft of property valued at more than $1,000, and he received an effective sentence of fifty-eight years. The sole issue raised on appeal is the sufficiency of the convicting evidence for the aggravated rape conviction. We conclude that the evidence is sufficient to support the jury's verdict, and we affirm the convictions. We remand for any further proceedings necessary to correct an error in the sentence related to the Defendant's theft conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Case Remanded**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Phyllis Aluko, Public Defender, and Harry E. Sayle III (on appeal), and Tom Leith and Mark Renken (at trial), Assistant Public Defenders, for the appellant, Stanley Jefferson.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Dru Carpenter and Jamie Kidd, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Defendant forced his way in to the home of the victim, who was in her mid-seventies, brutally beat her, raped her, and stole her vehicle. The State presented DNA evidence tying the Defendant to the sexual assault, DNA and physical evidence linking the Defendant to the recovered vehicle, GPS data linking the Defendant to the location of the crimes, the Defendant's confession to law enforcement, and evidence of the victim's injuries, which included a brain injury. The Defendant attempted to raise reasonable doubt based on the injured victim's confusion about both the day the assault took place and the details of the assault. The Defendant also attempted to present alternate suspects for the crime based on activity on the victim's cell phone.

The victim testified that on the evening of September 7, 2015, she was playing solitaire at her home in Shelby County. She recalled that it was Labor Day and that she had declined an invitation to join family and instead intended to watch a particular television program. The doorbell rang, and the victim, holding her cell phone, saw a man outside the door but told him she would not open the door because she did not know him. He responded that he was a sheriff's deputy, and she unlocked the door. As soon as the lock was disengaged, the man pushed his way into the home. The victim testified that the assailant was a black man with dreadlocks. The victim fought back "like something wild." The victim recalled that her assailant reached for the buttons on her shorts, and she began to pull his hair. The man began to beat her with his fists. The victim testified that she lost consciousness and regained consciousness as she was lying on the floor and heard a door open and shut. She did not move and lost consciousness again. She eventually used the bathroom and experienced a burning sensation. The victim lay down on her bed. She recalled vomiting twice and could not clean the vomit. She drifted in and out of consciousness. The victim attempted to use her landline to call her younger daughter, who lived in Memphis, but because the victim did not have her cell phone, she was unable to dial the correct number. She testified she was not sure how long she remained in bed. Eventually, her eldest daughter called her, and she asked her eldest daughter, who lived several states away, to contact her younger daughter. The victim was able to allow emergency personnel into the house, and her younger daughter arrived soon after. The victim testified that she experienced severe neck pain as she was moved to the hospital. She was unable to identify her assailant from a photographic array. She testified that she did not know the Defendant or have consensual intercourse with him.

On cross-examination, the victim agreed that she did not recall being sexually assaulted. She testified that she thought the assailant showed her a star-shaped badge. She clarified that she did not have an independent recollection of the badge at the time of

trial four years after the assault but that she had told her family about a badge around the time of the assault. The victim agreed that she had bitten the attacker as hard as she could on his hand. She likewise agreed that, while she never observed a second assailant, the thought that someone else might be in the house occurred to her when she first regained consciousness and that she continued to lie still to prevent further attack. She did not recall telling paramedics that there were two assailants but acknowledged she may have, noting that she experienced extreme confusion after the attack. The victim acknowledged she had not previously stated that her cell phone was in her hand when she answered the door but testified that she had never been asked where her cell phone was.

The victim acknowledged that at the time her eldest daughter called her, she believed that the attack had occurred the previous night, Tuesday, September 8th. She told the police the attack occurred Tuesday, and she "imagine[d]" she told her daughters the same. She explained that she had previously said the attack occurred on Tuesday because she did not account for the passage of time that took place while she was unconscious. The victim clarified that she went to the bathroom once prior to lying down and twice during the night. She stated that she thought both times she got up were "during the night," but she could not be sure because the bathroom had no natural light. She agreed that it was "much later" that someone from the police department suggested she may have been unconscious for more than a day. The victim testified that she had fed her dogs in their crates around 6:30 or 7:00 p.m. prior to the attack but had not yet given them water or taken them out to allow them to relieve themselves. She agreed that she was told that the dogs had not soiled their crates and that she found that difficult to reconcile with the idea that she was unconscious for over a day. She agreed that she had not said that the assault occurred on Labor Day to detectives or at a hearing prior to trial.

The assault against the victim was not immediately discovered because she lived alone and because her injuries prevented her from seeking help. The victim's eldest daughter testified that she lived in Florida but called her mother every Wednesday and that she attempted to contact her mother by telephone on Wednesday, September 9, 2015. The victim did not answer either her cell phone or her landline, and her eldest daughter called the landline a second time. The victim picked up the telephone but could barely speak and seemed confused and unsure of her eldest daughter's identity. The victim's eldest daughter, a nurse, suspected a stroke and began to question the victim, who told her, "The man came in, beat me up." The victim's eldest daughter asked her sister, who lived in Memphis, to call an ambulance.

The victim's younger daughter testified that the victim was in her mid-seventies and was "very capable" of living independently. She confirmed that her sister called her, asking her to check on the victim and indicating that the victim had exhibited slurred speech and confusion during their weekly telephone call. The victim's younger daughter,

fearing a stroke, immediately went to the victim's home, calling an ambulance en route. At the home, the victim's younger daughter noticed that the victim's vehicle was missing. Emergency personnel had just arrived and were taking the victim's vital signs as the victim sat near the door.

The victim's younger daughter described the victim's face as swollen, bruised, and disfigured, and she noted that the victim was wearing clothes from the night before. The victim was disoriented and unable to give clear answers. The victim's younger daughter noticed the victim's shorts lying on the floor in the combined living and dining room and stated the victim would not have left her clothing lying on the floor. The victim was placed on a gurney and transported across the yard, clutching her head and looking as though she were "in excruciating pain" every time the gurney was jostled.

Mr. Aubrey Hubbard, a paramedic with the Memphis Fire Department, confirmed that the victim had been severely beaten, was confused, was not wearing her shorts, and had vomit on her clothing. Mr. Hubbard testified that it was difficult to determine when the assault occurred and that the victim's eyes were so swollen that she had not been able to call for help. According to Mr. Hubbard's report, the victim stated that two men attacked her.

The victim's younger daughter stayed with the victim as she was transported to the hospital. The victim told her younger daughter that someone had come to the door presenting "some sort of star" and that the victim believed it was law enforcement and opened the door. The victim continued to be disoriented, was examined by the Rape Crisis team, and was transferred to a hospital that would have the capability to monitor her for brain injury. A small brain bleed was discovered. The victim was barely able to walk prior to discharge.

Dr. Erin James, an emergency room physician, found the victim suffering from bruising, swelling, and abrasions to her face. The victim's nose was fractured, and the victim developed a cerebellum hemorrhage. The victim appeared drowsy and confused, which was consistent with having lost consciousness. Dr. James agreed on cross-examination that the victim reported that the assault had taken place the previous night. However, Dr. James stated it would not be unusual for a victim of blunt force trauma to experience unconsciousness for over a day or to drift in and out of consciousness. The victim told Dr. James that she believed her assailant was trying to rape her but that she had lost consciousness, and Dr. James called the Rape Crisis Center to conduct an examination.

Ms. Nina Sublette, a forensic examiner at the Rape Crisis Center, examined the victim and collected physical evidence. She testified that she recalled the case

particularly because of the extent of the victim's injuries, and she identified photographs she had taken to document bruising and lacerations on the victim's face, neck, and arm and blood on her hand and fingers. Ms. Sublette conducted a pelvic examination and found dried blood on the victim's legs and lacerations to her vaginal introitus, including active bleeding from the victim's vagina, which indicated the lacerations were deep. The victim had a large laceration on the side of her vaginal opening. There was a large amount of fluid in the victim's vagina. Ms. Sublette collected swabs from various areas of the victim's body. On cross-examination, Ms. Sublette testified that it would have been impossible for the victim to have sustained these injuries from a struggle or being kneed in the crotch because the injuries were on the interior of the vagina.

The victim had a cell phone with no passcode to lock it. The victim's younger daughter testified that she checked her Facebook account while she was with her mother at the hospital. She discovered posts on the victim's Facebook account that were not things the victim would have posted and interactions with people the victim would not have known. She acknowledged on cross-examination that the Facebook posts were not to her knowledge linked to the Defendant's name or to his photograph.

The victim's eldest daughter traveled from Florida to help her mother convalesce and testified that her mother sustained many injuries, including swelling and bruising on her face. In particular, the victim's eldest daughter testified to severe bruising around the victim's windpipe, "like somebody had taken their thumbs and like pressed [—] it was just crushed." The victim was lucid but would only respond to direct questions and could not interact with the family. A week after the assault, the victim's younger daughter discovered and photographed extensive bruising on the back of the victim's neck after cutting the victim's hair.

Detective Gary Williams confirmed that the victim was severely beaten and "dazed." At the hospital, she told him that her assailant had said he was a deputy and showed her a star-shaped badge. The victim's home was ransacked, and there was blood in her bedroom.

The victim testified that she had bought her 2011 Honda Civic slightly used in 2011 for approximately $20,000. The victim's car was recovered from the Defendant's apartment complex. Crime Scene Officer Charles Cathey with the Memphis Police Department swabbed the victim's recovered vehicle for DNA. Officer Cathey also recovered from the vehicle a birth certificate copy request form from the Shelby County Office of Vital Records, which was filled out in pencil with the Defendant's name, birth date, and mother's name. Officer Cathey was unable to retrieve any fingerprints of value from the vehicle.

Special Agent Donna Nelson with the Tennessee Bureau of Investigation analyzed the DNA evidence. She found no semen on the vaginal swabs but discovered semen and spermatozoa on the vulvar swab and leg swab. The vulvar swab contained DNA from two individuals, and the minor contributor was consistent with the victim. The sperm from the vulvar and leg swabs came from the Defendant, with the probability of a randomly selected, unrelated individual having the same profile exceeding the world population. DNA from the gear shift of the victim's vehicle contained a mixture of two individuals, and was consistent with the DNA of the victim and the Defendant, with the probability of randomly selecting an unrelated individual having the same profile being approximately one in over twenty-three million for the African American population. She acknowledged the presence of an additional allele on both the vulvar swab and the DNA from the gear shift but stated it did not impact her determination that the DNA from both sources belonged to the Defendant.

In 2015, Mr. Richard Anderson was charged by the State of Tennessee with monitoring the Defendant's GPS ankle monitor through Satellite Tracking of People ("STOP"). He testified that the Defendant had a curfew and that the monitor would send an alert to Mr. Anderson and the Defendant if the Defendant went out after curfew. On September 7, 2015, which was Labor Day, the Defendant violated his curfew. Mr. Anderson acknowledged that he was initially contacted by law enforcement to determine if any of the people he monitored were in the vicinity of the victim's home on September 8, 2015, the day after Labor Day. Mr. Anderson told law enforcement there were no results, but he then recalled receiving an alert that the Defendant was in that area after curfew on September 7, 2015, and he confirmed the information and alerted law enforcement. Mr. Anderson identified a photograph of the Defendant, who wore his hair in dreadlocks at the time.

Ms. Ashley Fuller, who compiled and analyzed GPS data for STOP, testified that the Defendant's ankle monitor was accurate to within fifteen meters. In response to a request from Mr. Anderson, she determined that the Defendant was within fifty meters of the victim's address between 7:48 and 8:20 p.m. on September 7, 2015. Defense counsel questioned Ms. Fuller about a report generated by Mr. Anderson which showed the Defendant's location "flip-flopping" between nearby points, and she stated that she did not create and had not seen the report and that the accuracy of the user-generated reports was not guaranteed. The trial court ruled that the document itself was inadmissible.

Lieutenant Byron Braxton interviewed the Defendant in April 2016, after discovering the vital records application in the vehicle and confirming with Mr. Anderson that the Defendant was near the victim's home. The Defendant initially denied any involvement with the crime and stated he was with his sister that night and that he walked home. Lieutenant Braxton confronted him with information that his ankle monitor

showed him traveling faster than it was possible to walk, that it showed he was inside the victim's house, and that police had gathered DNA evidence. The Defendant then admitted that he impersonated a sheriff's deputy to gain entry to the home and that he struck the victim and stole her vehicle. The Defendant said he took the victim's pants off to get her keys and eventually said he digitally penetrated her vagina.

On cross-examination, Lieutenant Braxton agreed that he did not get a written statement from the Defendant and that he did not have a video or audio recording of the Defendant's confession. He confirmed that he initially investigated the date of September 8, 2015, because that was when the victim believed the assault took place. Lieutenant Braxton took over the case from an investigator who left the unit, and he confirmed that the prior investigator established that the photographs uploaded to the victim's Facebook page were of a man named Mr. Jerry Jones, but Lieutenant Braxton instead pursued the Defendant's connection to the victim. He did not recall telling another officer that he believed the Facebook photographs were the result of a hack.

The Defendant called Sergeant Samuel McMinn, who testified that he investigated the sexual assault and that the victim told him that a black man with dreadlocks showed her a star-shaped badge to induce her to open her door. The victim told him that she bit her assailant's hand. The next day, the victim's son-in-law informed Sergeant McMinn that a patient at the hospital with dreadlocks had stitches on his hand. Sergeant McMinn obtained the patient's information and that of another, similar patient, but the victim did not identify either in a photographic lineup. Sergeant McMinn was able to identify the individual linked to the suspicious activity on the victim's Facebook page as Mr. Jones, who was from Mississippi. The patients at the hospital were not connected to the Defendant or Mr. Jones, and further investigation ruled out Mr. Jones as the assailant. He agreed that Mr. Jones was a black man with dreadlocks.

The indictment charged the Defendant with aggravated rape by bodily injury, especially aggravated burglary based on an intent to commit theft, especially aggravated burglary based on an intent to commit assault, aggravated robbery of the cell phone through serious bodily injury, and theft of property valued $1,000 or more but less than $10,000. *See* T.C.A. §§ 39-13-502; 39-14-404, 39-13-402, 39-14-103. The jury convicted the Defendant of aggravated rape, two counts of especially aggravated burglary, aggravated assault as a lesser included offense of aggravated robbery, and theft of property valued at more than $1,000.

The Defendant was sentenced as a Range II offender based on his criminal history, which included a prior attempted rape, aggravated sexual battery of his four-year-old son, and domestic assault. Dr. John McCoy, a clinical and forensic psychologist, testified he administered IQ tests to the Defendant and that the Defendant scored a 52. Dr. McCoy

elaborated that he suspected the Defendant was not trying "sincerely" but that he nevertheless believed the Defendant's IQ was "extremely low." Dr. McCoy testified that the Defendant's mother said he was physically and sexually abused as a child, that the Defendant abused drugs and alcohol, and that the Defendant had been prescribed antipsychotic medication in jail. The trial court addressed the statutory enhancement and mitigating factors and the considerations relevant to consecutive sentencing. The trial court merged the especially aggravated burglary convictions and merged the aggravated assault conviction into the aggravated rape conviction. It sentenced the Defendant to serve forty years with a one hundred percent release eligibility for aggravated rape, eighteen years with a thirty-five percent release eligibility for especially aggravated burglary, and three years with a thirty-five percent release eligibility for Class D felony theft of property valued at over $1,000. The especially aggravated burglary sentence was to run consecutively to the aggravated rape sentence for an effective sentence of fifty-eight years.

The Defendant moved for a new trial, arguing that the evidence was insufficient, that the trial court erred in refusing to admit the satellite report generated by Mr. Anderson, and that the prosecutor made an improper closing argument. The trial court denied relief, and the Defendant appeals the sufficiency of the evidence.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant challenges only the sufficiency of the evidence with regard to the aggravated rape conviction, asserting that there was no proof of penetration. We conclude that the evidence supports the verdict.

This court must set aside a finding of guilt if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). The jury's guilty verdict, approved by the trial judge, accredits the State's witnesses and resolves all conflicts in favor of the prosecution. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The trier of fact is entrusted with determinations concerning witness credibility, factual findings, and the weight and value of evidence. *Smith*, 436 S.W.3d at 764. In reviewing the sufficiency of the evidence, we afford the State the strongest legitimate view of the

evidence and all reasonable inferences that can be drawn from the evidence. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury." *Reid*, 91 S.W.3d at 277. "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

As charged here, "[a]ggravated rape is unlawful sexual penetration of a victim by the defendant" where the defendant causes bodily injury to the victim. T.C.A. § 39-13-502(a)(2). Bodily injury "includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." T.C.A. § 39-11-106(a)(3). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501(7).

The Defendant, citing evidence of his low IQ introduced at sentencing, urges the court to discount his confession to sexually penetrating the victim digitally. However, the credibility of witnesses is a determination for the jury, and the jury was free to credit the confession. *See Smith*, 436 S.W.3d at 764. Furthermore, there was ample other evidence of penetration. While the victim did not recall being sexually penetrated, she did recall her assailant attempting to remove her shorts prior to beating her unconscious. She experienced a burning sensation when she used the bathroom afterwards. The victim had an actively bleeding laceration on her vaginal opening hours after the assault and had numerous other lacerations in her vulva. Ms. Sublette testified that it would have been impossible for the victim to have sustained these injuries from a struggle or being kneed in the crotch because the injuries were on the interior of the vagina. While the Defendant argues that the absence of semen in the vaginal swab weighs against a finding of penetration, the statute does not require the emission of semen. The victim sustained vaginal lacerations, and sperm was recovered from the victim's vulva and leg. Because sexual penetration is defined as any slight intrusion into the sexual organ, "'[i]t is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient.'" *State v. Bowles*, 52 S.W.3d 69, 74 (Tenn. 2001) (quoting *Hart v. State,* 21 S.W.3d 901, 905 (Tenn. 2000)). There is ample evidence to support the element of penetration and the conviction.

The Defendant's brief notes the victim could not identify her assailant. Insofar as the Defendant challenges the proof of identity, we conclude the evidence was

overwhelming. Identity is an essential element of every crime. *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015). The identification of the perpetrator of a crime is a question of fact for the jury. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). In resolving questions of fact, such as the identity of the perpetrator, "'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" *Pope*, 427 S.W.3d at 369 (quoting *State v. Hornsby,* 858 S.W.2d 892, 897 (Tenn. 1993)). Circumstantial evidence may assist in establishing identity. *See Bell*, 512 S.W.3d at 198-99. Here, the victim was beaten and sexually assaulted after a man matching the Defendant's description forced his way into her home and subsequently stole her vehicle. The Defendant's GPS ankle bracelet established that he was present in the vicinity of the victim's home at the time of the offense. The Defendant's sperm was found in two separate swabs taken from the victim's body. The Defendant's DNA was removed from the gear shift of the victim's stolen vehicle, and a vital records form with his personal information was recovered from the vehicle. The Defendant confessed to the crime. The evidence was overwhelming.

## II. Theft Offense Sentence

The judgment form in Count 5 reflects that the Defendant was sentenced to three years as a Range II offender for Class D felony theft. An authorized sentence for a Range II, multiple offender convicted of a Class D felony is four to eight years, and an authorized sentence for a Range II, multiple offender convicted of a Class E felony is two to four years. T.C.A. § 40-35-112(b)(4), (5). We note that the Defendant was indicted for theft of property valued at $1,000 or more but less than $10,000, which was a Class D felony at the time of the indictment, but the theft grading statute had reclassified theft of property valued at over $1,000 but less than $2,500 to a Class E felony by the time the Defendant was sentenced. *See* T.C.A. § 39-14-105(a)(3) (2015); 2016 Tennessee Laws Pub. Ch. 906 § 5 (eff. date Jan. 1, 2017). Tennessee Code Annotated section 39-11-112, the savings statute, applies to reduce the punishment for theft offenses committed prior to the change in the law when sentencing takes place after the law has gone into effect. *State v. Menke*, 590 S.W.3d 455, 468, 469 n.12 (Tenn. 2019); *see* T.C.A. § 39-11-112. Here, the jury fixed the value of the property at more than $1,000. The judgment form shows that the category of Class E felony is scribbled through and Class D felony is circled. The transcript of the sentencing hearing does not reveal whether the trial court applied the savings statute and simply committed clerical error in marking the incorrect Class on the judgment form or whether the savings statute was not applied. Accordingly, we remand for any further action necessary to correct the error in the sentence associated with the theft offense.

**CONCLUSION**

Based on the foregoing reasoning, we affirm the convictions and remand for further proceedings to correct the judgment regarding the sentencing of the Defendant for theft of property valued at over $1,000.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE